Stephen P. LASSER, Plaintiff,

v.

**RELIANCE STANDARD LIFE
INSURANCE COMPANY,**
Defendant.

No. CIV. A. 99–4131.

United States District Court,
D. New Jersey.

Feb. 8, 2001.

Lewis Stein, David J. Gruber, Nusbaum, Stein, Goldstein & Bronstein, Succasunna, NJ, for Plaintiff.

Joshua Bachrach, Rawle & Henderson, Marlton, NJ, for Defendant.

### *REVISED OPINION*

WOLIN, District Judge.

This matter was originally opened before the Court upon the motion of defen-

dant, Reliance Standard Life Insurance Company and the cross-motion of plaintiff Stephen P. Lasser, both seeking summary judgment. This Court issued an Opinion and Order dated November 8, 2000, denying both the motion and cross-motion. Since that time, the parties have been unable to agree as to how this matter should proceed and claim that the Court's earlier decision fails to provide clear guidance on the scope of evidence that may be considered at trial or what discovery should be had by the parties. After requesting a round of letter briefs on the issue, the Court has decided to treat these submissions as a request for leave to file a motion out of time to clarify or reconsider the November 8, 2000 Opinion.

On further review, the Court believes its earlier Opinion was sufficiently clear to convey accurately the Court's intent, and that the issues raised were, in fact, not fairly before the Court on the motion and cross-motion. However, to aid the progress of this litigation and to provide guidance to counsel on what are arguably unsettled issues in this area of the law, the Court will grant the motion to clarify or to reconsider.[1] The motion and the original motion and cross-motion for summary judgment have been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. The November 8, 2000 Opinion and Order will be vacated and replaced with this Opinion and the Order filed herewith.

The sections on the scope of the record to be considered by the Court at trial in this matter and the nature of that trial (sections 4 and 5) are new. It will be seen *infra* that the opportunity for further reflection has caused the Court to modify other sections of its Opinion in important respects. The intent of the Court has been to clarify rather than modify. However, to the extent any inconsistencies ap-

pear with the prior Opinion, this later Opinion will control in all respects.

## BACKGROUND

Except as noted, the following facts are not disputed. Plaintiff, Dr. Stephen P. Lasser, M.D., is an orthopedic surgeon employed by a four-doctor group known as Townsquare Orthopedic Associates. Dr. Lasser brings this case to recover disability benefits alleged to be owed to him by Reliance under a policy of disability insurance his employer maintains as an employee benefit. The policy defines total disability as the beneficiary's inability to perform "the material duties of his/her occupation." It is relevant to note that a partial disability (defined as either the ability to perform all of the material duties of one's occupation on a part-time basis, or less than all of the material duties on a full-time basis) is also considered a total disability for the purposes of an insured's right to receive full benefits under the Reliance policy.

Dr. Lasser has experienced trouble with his heart since the 1980's and underwent coronary bypass surgery in 1986. In 1996, Dr. Lasser suffered a myocardial infarction. At that time, Dr. Lasser's physicians discovered a number of problems with his heart and the earlier bypass. Dr. Robert F. Aldrich, plaintiff's treating physician, prescribed a treatment regimen, which included change of diet, exercise, and drug therapy. Significantly for this matter, Dr. Aldrich also prescribed reduced stress in Dr. Lasser's professional and personal life.

In September of 1996, Dr. Lasser returned to work on a markedly reduced schedule. His patient load was reduced 50%. He was no longer "on-call" at night or on weekends, nor did he perform emergency surgery. He removed himself from

---

1. The Third Circuit Court of Appeals has not spoken in the wake of its opinion in *Pinto v. Reliance Ins. Co.*, 214 F.3d 377 (3d Cir.2000), regarding the proper scope of the record to be examined and the type of trial to be conduct-

ed in cases where the rule of that decision applies. These points have received little attention yet in the district courts and remain questions of first impression for this judge.

participation in the management of the group. His compensation fell from approximately $28,000 per month to approximately $6,000.

In December 1996, Reliance approved Dr. Lasser's application for long-term disability benefits under Townsquare Orthopedic's policy. This approval was based, at least in part, upon Dr. Aldrich's statement on Reliance's Physician's Statement form that Dr. Lasser could return to work on a limited basis only. However, in June 1997, Reliance began to request additional proof of Dr. Lasser's disability. Reliance solicited another statement from Dr. Aldrich. Reliance also retained Dr. William M. Burke, who examined plaintiff and subjected him to a treadmill exercise tolerance test. Reliance reviewed the Department of Labor's Dictionary of Occupational Titles (hereinafter "DOT"), and determined the physical requirements of an orthopedic surgeon.

Reliance terminated Dr. Lasser's benefits by letter dated December 8, 1997. In the letter, Reliance relied primarily upon Dr. Burke's findings that Lasser did not demonstrate "any cardiovascular disability," that his prognosis "is excellent," and that his physical capabilities show the capacity to work "without restriction."

Dr. Lasser sought a review of the benefits termination, and submitted a number of reports from medical experts. These doctors supported the position that occupational stress, as opposed to physical exertion, was dangerous to Dr. Lasser's condition. These reports were also critical of both Dr. Burke's conclusions and his methodology. Reliance sought a second independent opinion from Dr. Karel Raska which was also critical of Dr. Burke. Following receipt of Dr. Raska's report, Reliance claims to have discovered a conflict of interest, in that Dr. Raska is affiliated with the same practice group as one of the medical experts retained by plaintiff. Reliance then sought the opinion of a Dr. Field. The details of these second and third opinions obtained by Reliance will be discussed below. They do not unequivocally support Reliance's position.

In addition to the DOT, Reliance also commissioned a study from a vocational expert to determine whether a doctor who cannot perform emergency surgery and cannot be "on-call" could, nonetheless, perform the material duties of the occupation of an orthopedic surgeon. The vocational expert performed a survey of professionals in the field and concluded that an orthopedic surgeon could practice in this field despite the listed limitations, "however, this type of work setting typically involves special circumstances and these circumstances are available only rarely or occasionally." Following a review of the survey results by an in-house vocational expert, Reliance affirmed the termination of Dr. Lasser's benefits.

Although still operating on a reduced schedule, Dr. Lasser has been taking some "on-call" duty, wearing a pager, and performing emergency surgery. He has testified by affidavit that he is forced to do this by financial hardship following the termination of his benefits by Reliance.

## DISCUSSION

### 1. Summary judgment and the standard of review.

The standard for deciding a motion for summary judgment has been stated many times by this Court and will be addressed only briefly here. Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir.1986).

Whether a fact is "material" is determined by the substantive law defining the claims. Id. at 248; United States v. 225 Cartons, 871 F.2d 409, 419 (3d Cir.1989).

Of course, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ The substantive law governing this matter is the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, pursuant to which this lawsuit is brought. *See* 29 U.S.C. § 1132(a)(1)(B)(participant or beneficiary may bring suit to recover benefits due under an ERISA-governed benefits plan). In *Firestone Tire & Rubber Co. v. Bruch*, the United States Supreme Court held that a claim regarding a denial of benefits is reviewed under an arbitrary and capricious standard if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

The Third Circuit only recently acted to dispel confusion created by certain questions left unanswered by the Supreme Court in *Bruch*, in a case concerning the same defendant-insurer at bar. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir.2000). The policy at issue in *Pinto* is conceded to be the same as the policy owned by Dr. Lasser's employer with respect to the role of the Plan Administrator. In an earlier, unreported decision, the Court of Appeals held that this policy confers discretion on the fiduciary, thus triggering *Bruch*'s deferential standard of review. *Pinto v. Reliance Standard Life Ins. Co.*, 156 F.3d 1225 (3d Cir. 1998).

■ In *Bruch*, the High Court suggested that deference might, however, not be appropriate where the fiduciary had an conflict of interest with respect to the decision of whether to award benefits. 489 U.S. at 115, 109 S.Ct. 948. In *Pinto*, the Court of Appeals addressed the problem of the inherent conflict, where the fiduciary's decision to award benefits will come at a direct cost to the fiduciary itself. The inherent conflict problem is presented in its classic form where an insurance company both administrates plan benefits and pays those benefits from its own funds. *Bruch*, having identified the problem, conspicuously failed to offer guidance in evaluating the benefits decisions of such conflicted fiduciaries.

From a variety of solutions employed in various federal circuits, our Third Circuit chose the "sliding scale" approach. This is termed a "heightened arbitrary and capricious standard," 214 F.3d at 392, in which the level of scrutiny of the fiduciary's decision "'is a range not a point ... [it is] more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is.'" *Id.* (quoting *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir.1992)(alterations in original)). Acknowledging that bias is unlikely to be revealed by an evidentiary "smoking gun," the *Pinto* court directs the district courts to examine the facts of the particular case, *id.* at 392, and to "ratchet upward" the standard of review where those facts suggest the fiduciary was acting in its own self-interest. *Id.* at 394.

In *Pinto*, the Court of Appeals found several suggestive features requiring a heightened level of scrutiny. First, the fiduciary reversed its earlier grant of benefits without a significant change in the factual record upon which it had based its earlier decision. *Id.* at 393. Second, the fiduciary's written decision employed a self-serving selectivity in the evidence it considered. *Id.* at 394. Third, Reliance failed to follow the recommendation of its own personnel to grant benefits pending further testing, suggesting to the Court of Appeals that the "default position" was to withhold benefits. *Id. Pinto* teaches that the considerations that guide the essentially *sui generis* inquiry in one case cannot uncritically be transferred to another case.

However, this Court is guided by the kind of factors examined and the weight afforded them by the Court of Appeals to remove the standard of review in that case to "the far end of the arbitrary and capricious range." *Id.*

The Court will be careful not to permit the question of facts indicating a conflict of interest and the appropriate standard of review to blur its assessment of the ultimate merits of the case. The only question presented by the pending motion and cross-motion is whether a rational fact-finder could find for one, the other, or either of the two parties to this action. Deciding the appropriate level of review is merely an antecedent step to this issue, itself an intermediate point on the way to the ultimate resolution of this controversy.

## 2. Factors favoring heightened arbitrary and capricious review.

■ The Court is satisfied that the record of this case discloses at least two significant problems with Reliance's handling of Dr. Lasser's claim for benefits. These problems require scrutiny of the fiduciary's decision to be substantially increased. The first concerns Reliance's use of expert medical opinion, and the second concerns the vocational experts' data and conclusion regarding the material tasks of an orthopedic surgeon.

Dr. Lasser attempts to bring his case in line with *Pinto* by noting that Reliance reversed itself after first granting the benefits. By itself, the Court would attach little weight to this fact. The policy gives Reliance the right periodically to review continued eligibility for benefits. Necessarily, this includes the ability to supplement the medical record. One suggestive fact is undeniable. Kathy Young, R.N., employed by Reliance to review the medical records of disability claimants, substantially revised her assessment of Dr. Lasser in October 1997, based upon his successful performance on an exercise test, and lack of recent symptoms. The Court finds this of limited significance, because Nurse Young was not the final decision maker, and because the distinction between Dr. Lasser's ability to deal with occupational stress and his ability to do physical exercise may have been beyond her level of expertise.

Nurse Young recommended an independent medical examination, which led to Dr. Lasser's visit to Dr. Burke. It is here that the difficulties commence for Reliance's handling of the case. Dr. Burke found that plaintiff was capable of working without restriction, and that plaintiff demonstrated no cardiovascular disability. Dr. Burke's treadmill exercise test showed "excellent exercise tolerance" as related by Reliance. No mention was made either in Reliance's termination letter or in Dr. Burke's report of the issue of occupational stress that featured so prominently in Dr. Aldrich's earlier reports. Indeed, Reliance stated that the attending physician's findings "were not supported by the objective medical findings."

Dr. Aldrich responded with the first of many subsequent criticisms of Dr. Burke's opinion, by letter dated March 25, 1998. The point was not, Dr. Aldrich maintained, that Dr. Lasser could perform well on a treadmill. The relevant point was that stress is a well-known risk factor for precipitating myocardial infarction. Dr. Aldrich stated that the therapeutic goal was to preserve the level of physical function identified by Dr. Burke. Were he to return to a stressful occupation, Dr. Aldrich wrote, "I believe that the risk of myocardial infarction with all of its attendant morbidity and mortality will rise."

Having already rejected Dr. Aldrich's opinion, it is not surprising that Reliance should have declined to reconsider based upon his March 1998 letter. However, the second independent opinion obtained by Reliance, from Dr. Raska, is even more critical of Dr. Burke. The following excerpts from his report are telling:

As part of his independent evaluation by Dr. William Burke, the patient under-

went a repeat stress test utilizing a protocol not known to be accepted as conventional to any clinical cardiologist.

. . .

Stress regardless of exercise tolerance is a recognized independent risk factor for recurrent coronary artery disease.

. . .

A reduced stress work environment and schedule is absolutely necessary to maintain this patient's health

. . .

Reviewing Dr. Burke's independent assessment, it is clear that his analysis was, in fact, sloppy.

. . .

It is clear to me that Dr. Burke's analysis of Dr. Lasser's case was sloppy and, in fact, inaccurate. His treadmill exercise protocol is absolutely not the standard of care. Additionally, his review of records appears to have been inadequate. Finally, his therapeutic recommendations do not meet the American Heart Association guidelines.

Thus, in conclusion, Dr. Lasser should be considered permanently partially disabled. His cardiovascular anatomy is known and although no demonstrable ischemia can be shown on a stress test at present, his prognosis for the long-term is not excellent as Dr. Burke describes. If the patient's saphenous vein graft fails, he is at risk for significant myocardial infarction. Clearly, stress can play a role in the precipitation of such an event.

This report, obtained by Reliance itself as an independent second opinion, devastates the credibility of Dr. Burke's opinion. The issue of stress as opposed to physical exercise tolerance was emphasized by Dr. Aldrich and, more emphatically, by Dr. Raska. Again, Dr. Burke never even addressed this issue.

Dr. Lowell, an associate of Dr. Aldrich, had performed a cardiac catheterization and angioplasty on Dr. Lasser. Dr. Lowell also provided an opinion and observed that Dr. Burke had failed to note that the vein graft on Dr. Lasser's heart was not as post-operative records had indicated. Dr. Lowell characterized the bypass as "failed" and wrote that "[i]t is clearly just a matter of time before Steve has problems with his vein graft to the anterior and lateral surfaces of his heart." The main vessel in his heart is "compromised by a 60% obstructive plaque." "This critical anatomical point ought to have played a role in Dr. Burke's determination because of the likely role stress will play in Dr. Lasser's future health." In fact, Dr. Burke's report makes no mention at all of the physiognomy of Dr. Lasser's heart.

Dr. Lasser also consulted an independent physician, Dr. Lawrence A. Lubow. Dr. Lubow's opinion parallels that of doctors, Raska, Aldrich and Lowell. Again, Dr. Burke's work was sharply criticized. Dr. Burke's mis-citation of the records he claims to have examined led Dr. Lubow to question whether Dr. Burke looked at the records at all. Dr. Lubow emphasized Dr. Burke's failure to note the unsuccessful nature of Dr. Lasser's bypass surgery. Dr. Lubow noted statistical evidence that the vein graft might not last more than another three to five years. Finally, Dr. Lubow reiterated the danger posed by occupational stress.

Reliance seems to have been unwilling to concede the gathering weight of medical opinion. Instead, Reliance claims to have discovered a conflict of interest in Dr. Raska, based upon the fact that he belongs to the same practice group as Dr. Lubow. This in itself is questionable. Although their association might lead these doctors to agree with each other, the fact that both Lubow and Raska were selected as independent consultants by both sides hardly shows a pre-disposition to bias toward either Reliance or Dr. Lasser. Further, Dr. Lubow testifies by affidavit that he was unaware that Dr. Raska had been retained by Reliance and that he never discussed his opinion in the case with Dr. Raska until

after both physicians had made their reports.

In any event, Reliance's final choice, a Dr. Fields, essentially endorsed the conclusions of the earlier reports. Dr. Fields noted that exercise performance can support a general prognosis, but cannot predict future cardiac events. While hedging on the state of scientific certainty in the cause and effect relationship between stress and heart attack, Dr. Fields wrote that "[c]ardiovascular prudence" restricts acute emotional or physical stress from which the patient could not immediately withdraw. Dr. Fields concurred with the other doctors that Dr. Lasser should not be on call or perform emergency duties. He wrote that Dr. Lasser "is not capable of resuming the customary duties of and responsibilities of an orthopedic surgeon." A forty-hour work week was permissible, Dr. Fields opined, if limited to out-patient and consultative orthopedics "with some elective surgery."

In its letter affirming the denial of Dr. Lasser's benefits, Reliance stood by the opinion of Dr. Burke. In the alternative, however, Reliance also argued that each of the other doctors had found only that Dr. Lasser should not be on-call or perform emergency surgery. Maintaining that on-call status and emergency surgery are not material tasks of the occupation of an orthopedic surgeon, Reliance claimed that each of the doctors found that Dr. Lasser could work full-time at his occupation and still observe the above limitations. As to the several statements in the medical opinions that Dr. Lasser was disabled from his occupation as an orthopedic surgeon, Reliance took the position that these doctors had exceeded their area of expertise by opining on issues of vocational science.

In fact, Reliance was in error when it stated that each of the doctors opined that Dr. Lasser could work full-time provided he avoided on-call status and emergency surgery. Actually, Dr. Fields is alone in stating that Dr. Lasser could work full-time (not including Dr. Burke who saw no

reason for any limitation). Indeed, Dr. Lubow specifically cites long hours as a source of risky occupational stress and the desirability of a "change in schedule and lightening of his duties" in addition to the elimination of emergency and on-call duties.

The Court believes that the manner in which Reliance has treated the medical record in this case requires the Court to travel a considerable distance along *Pinto*'s sliding scale and substantially to reduce the deference otherwise afforded to the fiduciary's termination of benefits. Continuing to defend Dr. Burke's conclusions is very difficult to reconcile with the assumption that Reliance performed a fair review of the record. Reliance professed to need yet more medical opinion following the reports of Drs. Lubow and Raska, who, though affiliated with each other, were independent of either of the parties.

An insistence on more evidence in the face of medical opinion favoring the beneficiary must at some point suggest that the insurer's conflict of interest has affected its benefits determination. Here, while the issue is not completely clear cut, rejecting the Raska and Lubow opinions adds to the circumstances one may fairly deem "suspicious." Finally, Reliance's assertion in the affirmance letter that all of the doctors supported a return to a forty-hour work week is simply a misstatement of the record.

In sum, with due regard for the unique facts that each case must inevitably present, the Court feels that the situation here presents a variant of the factor identified in *Pinto* concerning selective use of the evidence. Compelling medical evidence exists that the occupational stress of full-time employment as an orthopedic surgeon is unacceptably dangerous for Dr. Lasser. Reliance's argument that Dr. Lasser has recently engaged in full-time practice (including on-call status and emergency surgery) without ill effects proves nothing. It is surely not reason-

able to require that Dr. Lasser suffer another heart attack before receiving benefits. The concern over occupational stress stands completely unrebutted in the medical record. Reliance's focus on Dr. Lasser's exercise tolerance constitutes selective use and self-serving use of the evidence, suggesting that its decision to deny benefits was tainted by its inherent conflict of interest.

Rather than tackling the medical evidence frontally, Reliance attempts to redirect the argument toward the definition of Dr. Lasser's occupation. The insurer argues that the occupation of orthopedic surgeon does not necessarily include emergency surgery and on-call status as material tasks. If the occupation exists in the national economy as a full-time position without these two, extra-stressful tasks, Reliance argues, then Dr. Lasser is not disabled within the terms of the policy. Of course, this leaves aside the issue of whether Dr. Lasser can work a forty-hour week even with these limitations, a position taken only by Dr. Fields. Even as stated, however, Reliance's methodology is problematic in this area as well.

Reliance relies heavily on the Department of Labor's DOT definition of the occupation. Whatever may be said for the persuasive effect of this publication in other fields, the Court finds it far too blunt an instrument to be instructive as to the material duties of an orthopedic surgeon. The pages from the DOT submitted to the Court only purport to define the occupation of "Surgeon." Orthopedic surgeon is mentioned merely as an "Undefined Related Title." Few would doubt that emergency surgery is a necessary task for the position of an emergency room surgeon and that the position is supremely stressful. On other hand, a plastic surgeon might well perform only elective surgery during regular hours. The DOT is simply silent regarding where on this continuum the occupation of orthopedic surgeon might lie.

Likewise the survey performed by Reliance is patently flawed. The study was performed by sending approximately 100 e-mails to orthopedic surgeons across the country, asking them

> In general, in your experience is it reasonable that an Orthopedic Surgeon can practice in this field if one:
>
> A. Cannot perform "on-call" duties; do night calls, or carry a pager
>
> ___ NO ___ YES·
>
> B. Cannot perform emergency surgery [even if one can do non-emergency, elective surgery]
>
> ___ NO ___ YES

Respondents who answered yes to either A or B were asked to estimate the "approximate prevalence" of jobs in the general economy of jobs for orthopedic surgeons with the specified limitations on their duties. The choices were "none to rare", "Occasional [< than ⅓ of all jobs in the economy]," and "Frequent [> than ⅔ of all jobs in the economy]."

First, as counsel pointed out to Reliance during the internal appeal phase, the survey does not mention the possibility that the orthopedic surgeon might not be able to work a forty-hour week. Reliance's in-house vocational expert opined that full-time employment was implicit in the question. This hardly obviates the problem, however, because the medical evidence suggesting that Dr. Lasser should not work full-time has never been squarely addressed by Reliance.

Reliance's analysis of the survey results is also troubling. In its letter affirming the denial of benefits, Reliance wrote that "the majority of respondents did acknowledge that the occupation can be performed on a full-time basis without on-call and emergency surgery duties." Actually, of the fourteen respondents to the e-mail survey, five answered "No" to both questions and three answered "Yes" to one or both questions, but estimated the prevalence of jobs with the listed limitations as "None or

rare." [2] One respondent stated that any such practice would be limited to writing reports, an occupational activity clearly not equivalent to that of an orthopedic surgeon. Four respondents said that jobs for such a restricted orthopedic surgeon were "Occasional [< ⅛ of all jobs in the economy]" and one provided a narrative response that said such a practice "probably" could be arranged.

To characterize this as a "majority" of responses bolstering Reliance's assessment that Dr. Lasser was able to continue unimpaired in his occupation is flatly inaccurate. Indeed, it is difficult to discern what useful information may be gleaned from the survey. For example, while Reliance concedes that some respondents indicated that positions for Dr. Lasser were "rare," in fact one cannot tell whether the respondent meant that jobs were rare, or actually "none." Finally, the limited number of responses, the lack of analysis of the geographical distribution of the respondents and the lack of any control or filter questions usually found in a professionally conducted survey, are obvious indicators that this survey is far from authoritative.

The Court finds in Reliance's treatment of Dr. Lasser's case a willingness to credit obviously questionable evidence that favor termination of benefits and a studied refusal to even address evidence that favors Dr. Lasser. At points, Reliance simply mis-states the evidentiary record in its benefits termination letters. These findings strongly suggest that uncritical deference to the fiduciary's denial of benefits would be error.

It is true that certain factors present in *Pinto* are not implicated here. For example, there is no clear-cut reversal of position as in the *Pinto* case. On the other hand, there are common features as well. For example, like in *Pinto*, the insurer has focused narrowly on the beneficiary's ability to perform, rejecting without explana-

tion medical opinion that the beneficiary risks sudden, severe deterioration if full-time employment continues. *See* 214 F.3d at 394. More fundamentally, the flaws in the factual bases for Reliance's decision to terminate Dr. Lasser's benefits permit the inference that the insurer's decision was influenced by its inherent conflict of interest.

Therefore, following *Pinto*, the Court believes that a substantially more stringent level of arbitrary and capricious review must be applied to this matter. The *Pinto* Court found sufficient evidence of conflict to cause it to "examine the facts before the administrator with a high degree of scepticism." *Id.* Acknowledging the differences between *Pinto* and this case, and attempting to "approximately calibrate[ ] the intensity of ... review to the intensity of the conflict," *id.* at 393, this Court believes that *Pinto*'s "high degree of scepticism" is excessive. Indeed, the *Pinto* formulation appears to presume that the fiduciary erred, a presumption this Court is unwilling to engage in at this time. However, given this troubled record, it would be inappropriate to grant more than a minimal amount of deference to the administrator's resolution of the contested issues before it.

No pre-existing term of art accurately captures the amount of scrutiny with which the Court would examine the administrator's decision in this case. The Court would not reverse if it found the evidence to be in equipoise or that a bare preponderance of the evidence is contrary to the administrator's determination. If, however, a substantial body of the evidence in the administrative record favors Dr. Lasser and that evidence stands unrebutted, the "heightened arbitrary and capricious" review appropriate on the facts of this case may compel a different result. In that event, the Court must lessen the deference normally attributed to the administrator's

---

**2.** The Court is relying upon the documents submitted by plaintiff, certified by counsel to be the actual responses to the survey. Reli-

ance did not submit the raw data obtained by the survey.

decision, heighten the degree of scrutiny to match the degree of conflict, and, in all likelihood, reverse the decision below

This level of scrutiny is not fixed in stone, however. The parties should be alert to the fact that the Court, *infra*, deems it inappropriate to rule on the extent of the administrator's conflict of interest as a matter of law.[3] Thus, at trial, the Court will consider all the evidence relevant to the degree of conflict and the resulting location on *Pinto*'s range of heightened arbitrary and capricious review, and the Court will render a plenary determination of those issues at that time. At this stage of the proceeding, the level of intrusiveness with which the Court will review the denial of benefits is still an open question. The facts that emerge may confirm the Court's view as already expressed. These facts may, however, move the Court either further along the scale towards *Pinto*'s "high degree of scepticism" or, assuming the problems already identified are satisfactorily explained, back towards a more deferential standard of review.

### 3. Application of the summary judgment standard.

■ It should be clear that the above discussion has no direct bearing on the ultimate question in this matter. That issue, whether Reliance's decision was arbitrary and capricious (as flexibly applied) on the facts presented to it,[4] *id.* at 394 n. 8, is of course distinct from fixing the appropriate level of heightened arbitrary and capricious review at the correct place on *Pinto*'s sliding scale. The proper level of scrutiny being provisionally identified, the Court now applies this mode of analysis to

the issue of whether summary judgment is appropriate.

At least two critical issues of fact were presented to the plan administrator considering Dr. Lasser's claim. First, what limitations on Dr. Lasser's professional activity are medically justified? Second, assuming these limitations are well-founded, are the duties for which Dr. Lasser is disabled non-material such that he can nonetheless function in the occupation of an orthopedic surgeon? Subsidiary to this second issue is the factual question: what tasks and duties are necessary components of the occupation of an orthopedic surgeon?

The cases cited by Reliance on this point, none of which is binding on this court, are readily distinguished. These either concern doctors who had substantial, administrative components to their occupations for which they were not disabled, or dealt with different policies. Significantly, none of these cases addressed a policy that provided for total disability benefits where the insured was disabled from performing only some of the material tasks of his occupation. Nor do they compel as a matter of law the conclusion that emergency surgery and on-call duty either are or are not a material part of the occupation of an orthopedic surgeon. *Cf. Ames v. Provident Life & Accident Ins. Co.*, 942 F.Supp. 551, 557 (S.D.Fla.1994) (refusing to grant J.N.O.V. where evidence existed both *pro* and *con* that inability to practice surgery constituted total disability for orthopedic surgeon), *aff'd*, 86 F.3d 1168 (11th Cir. 1996).

Assuredly, a court could find for either party when considering the administrator's resolution of these factual questions under the heightened standard of arbitrary and

---

**3.** The Court's holding on this point is, of course, confined to the facts of this case. The Court believes, however, that only in the rare exception will so fact-sensitive an issue as inherent conflict and resulting bias of an ERISA administrator be appropriate for summary judgment.

**4.** The Court suggests that this phrase, which is copied verbatim from the November 8, 2000 Opinion should have removed any doubt regarding what evidence was to be considered when the Court makes its final determination of whether the denial of benefits was arbitrary and capricious.

capricious review discussed. Clearly, as in *Pinto*, "a factfinder could conclude that Reliance Standard's decision to credit its doctors over [the beneficiary's doctors] was the result of self-dealing instead of the result of a trustee carefully exercising its fiduciary duties to grant [the beneficiary] the benefits due [him] under the insurance plan." *Id.* at 394. Having made this determination, the Court will not risk prejudging the outcome of these issues by an extended discussion of the record. Review of the discussion above will disclose that parties have advanced to the Court some factual support for each of their positions on the underlying merits of the claim as well as on the extent to which the administrator's decision was tainted by his employer's self-interest. This observation alone merits the denial of summary judgment. Surely credibility determinations as to the medical evidence will have to be made by the trier of fact.

### 4. The scope of the record.

The motion for clarification or reconsideration arose from counsel's professed uncertainty over the proper scope of discovery in this matter following the Court's previous Opinion. Plaintiff's counsel argued that plaintiff was entitled to discovery to prepare for a full-blown evidentiary trial on all the issues implicated by his claim, including those concerning his disability and ability to practice his profession. Defendant objected, saying that the Court's review of the underlying merits of the plaintiff's claim should be limited to the record before the administrator. Consequently, according to defendant, no discovery on these issues is appropriate. After full consideration of the issue, the Court is satisfied that the breadth of discovery sought by the plaintiff is contrary to law.

The supplemental briefing by the parties has revealed the precise contours of the dispute. The parties agree that the Court is not limited to the record below in weighing the existence or extent of the conflict of interest and resulting possibility of bias of the administrator in deciding the claim. As discussed, this factual question must be answered to decide how intrusive the Court's examination of the administrator's decision will be under *Pinto*'s heightened arbitrary and capricious sliding scale of review. The disagreement is limited to whether the Court can consider (and the parties discover) evidence *dehors* the record on the substantive merits of Dr. Lasser's disability.

Where *de novo* review of an ERISA benefits decision is appropriate, the Third Circuit has clearly held that the district court "is not limited to the evidence before the Fund Administrator." *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1184–85 (3d Cir.1991). In such a case, the court may hold a full trial *de novo*, although it is not required to do so. *Id.* at 1185. Expanding the record "is crucial in cases ... where there is no evidentiary record to review." *Id.* Indeed, such review is not really a review of the prior decision at all; in reality it is a do-over of the entire proceeding. On the other hand, where the arbitrary and capricious standard controls, Court of Appeals has been equally clear that the reviewing court is limited to the record before the plan administrator. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997).

*Pinto* complicates the matter by teaching that in some circumstances the choice of the standard of review is not a binary, either-or matter. Under *Pinto* the appropriate level of review lies somewhere on a "sliding scale" or a "range," beginning at true arbitrary-and-capricious deference to the administrator and ending at some very much more intrusive level of inquiry, in which the administrator's findings are treated to a "high degree of skepticism." 214 F.3d at 394. As the *Pinto* court itself admitted: "once 'factors' [*i.e.* factors suggesting a biased benefits decision] are introduced, arbitrary and capricious stops sounding like arbitrary and capricious and

more like some form of intermediate scrutiny, which has no analogue in this field." 214 F.3d at 392. Plaintiff asks the Court to confront the possibility that the rule against considering evidence outside the record is likewise not a matter of black or white, but should be tempered to serve the level of scrutiny the Court deems appropriate in the particular case.

The Court is, however, convinced that the record should not be expanded when employing heightened arbitrary and capricious review under *Pinto*. *De novo* review of ERISA benefits determinations serves a different set of interests than even the most intrusive scrutiny under *Pinto*. The "sliding scale" does not slide all the way to *Luby*-style, *de novo* review. Even at the far end of the range, heightened arbitrary and capricious review is different in kind. Therefore, despite the more penetrating review the determination may receive, expanding the record by analogy to *Luby* would be wrong.

■ In an ERISA benefits case, if *de novo* review applies, *a priori* the plan administrator enjoyed no discretion and made benefits decisions on pain of error. An erroneous denial constitutes a direct breach of the benefits provisions of the plan, and review in this Court under ERISA goes straight to the question of entitlement. *See Bruch*, 489 U.S. at 112–13, 109 S.Ct. 948. In contrast, where the plan grants discretion to the administrator, the beneficiary is entitled only to insist that the administrator's authority be exercised within the bounds of the discretion granted. Because the focus is on the administrator's performance, *see* 2 Steven A. Childress, *Federal Standards of Review* § 15.08 at 15–45 (3d ed., 1999), review is necessarily confined to the evidence before the administrator.

■ It follows that, where the plan beneficiary's rights are to a benefits determination untainted by a conflict of interest, then a review of the same evidentiary record by an unbiased decision-maker should restore the beneficiary to the *status quo ante*. As one court in this Circuit has reasoned, if the beneficiary had a fair opportunity to put evidence before the plan administrator, limiting the record on judicial review should result in no prejudice. *O'Sullivan v. Metropolitan Life Ins. Co.*, 114 F.Supp.2d 303, 309–10 (D.N.J.2000). As in conventional arbitrary and capricious review, the proper focus is on the performance of the administrator and the record should therefore be limited to that which was before the administrator when it made the decision.

Those district courts addressing the issue have reached the same conclusion, and held that they should not expand the record "on the historic facts that informed the administrator's decision" even though a conflict of interest may mandate a more intrusive review under *Pinto*. *Friess v. Reliance Standard Ins. Co.*, 122 F.Supp.2d 566, 573 (E.D.Pa.2000); *O'Sullivan v. Metropolitan Life Ins. Co.*, 114 F.Supp.2d 303, 309–10 (D.N.J.2000); *Ernest v. Plan Administrator of the Insured Benefits Plan*, 124 F.Supp.2d 884 (M.D.Pa.2000). Although *Pinto* itself is silent on whether the district court may consider new evidence on the underlying merits when applying heightened arbitrary and capricious review, *O'Sullivan*, 114 F.Supp.2d at 309 n. 6, the opinion of the Court of Appeals in *Pinto* may be read to suggest that the record should not be expanded.

In a footnote, the Court of Appeals stated:

Our focus on process should not be read to require an additional duty to conduct a good faith reasonable investigation. That is, we are not holding that [the administrator] had a duty to gather more information, merely that the decision might have been arbitrary and capricious *given the information available*.

214 F.3d at 394 n. 8 (emphasis added). Plainly heightened arbitrary and capricious review is still a review of the decision below. It is not a do-over of the administrative proceeding and thus qualitatively

different from the *de novo* review contemplated by *Luby*.

*Pinto*'s footnote eight poses another problem, however. If the administrator has no duty to investigate, it follows that the administrator has no duty to create a record upon which to rule and that the burden to do so and must fall solely on the beneficiary. This suggests that where the record before the administrator is insufficient to decide one way or the other regarding an entitlement to benefits, denial cannot have been arbitrary and capricious regardless of the grounds stated by the administrator. Of course, where there is sufficient evidence to permit a reasonable determination of the entitlement to benefits, there is no need to expand the record. *Pinto*'s footnote eight suggests that even where the administrative record was inadequate to make a ruling, the Court still should not go beyond the evidence before the administrator.

The Court is not sanguine that such an absolutist approach correctly reflects either the Third Circuit's view or the underlying purposes of the ERISA statute. This Court is well aware of the oft-repeated concern to focus the disposition of benefits disputes in the administrative process established by the plan, and to avoid judicial second-guessing to the extent possible. One hopes, of course, that the self-dealing administrator and the application of *Pinto* will be the exception. If so, the concerns of judicial efficiency and/or entanglement with the ERISA process will be less urgent. More to the point, if one assumes a biased and self-interested benefits administrator and an empty record on an important element of the claim, refusing to consider additional evidence that may shed light on the merits of the claim raises real questions of fairness and of whether ERISA's statutory purpose is being served.

The Court has not yet ruled whether the administrative record in this matter is adequate or not. The Court has raised this issue to highlight the potential problem, and to suggest a solution should one be necessary. The Fourth Circuit permits a remand to the administrator where the record is inadequate to decide one way or the other whether the benefits determination was reasonable. *See Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 789 (4th Cir.1995); *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 125 (4th Cir.1994). As noted, a remand would appear to be inconsistent with *Pinto*'s footnote eight where the evidentiary burden is on the beneficiary. However, in *Bernstein,* the Fourth Circuit remanded notwithstanding the fact that the administrator had the burden of proof on the evidentiary point at issue. 70 F.3d at 790.

Assuming symmetrical fairness, *Bernstein* suggests that the Fourth Circuit would not withhold a remand from either party on the ground that an insufficient record constitutes a mere failure of proof on the part of the burdened party. Of course, it would not offend the logic of *Pinto* to remand where the administrator's conflict of interest had led it manipulate the record to exclude evidence favorable to the beneficiary. The Third Circuit's refusal to impose upon the administrator a duty to investigate does not mean the Court of Appeals would protect an administrator's bad faith truncation of the record.

Likewise, where an administrator's arbitrary and capricious resolution of an antecedent factual issue has caused error at a later stage of the analysis, remand to permit a fuller development of the record might well be appropriate. In fact, remand is consistent with an established practice in arbitrary and capricious review of ERISA benefits decisions. *See, e.g., Peterson v. Continental Cas. Co.,* 77 F.Supp.2d 420, 429 (S.D.N.Y.1999); *Sova v. Wheaton Franciscan Servs., Inc. v. Health & Welfare Benefit Trust,* 40 F.Supp.2d 1031, 1042 (E.D.Wis.1999).

Lastly, remand in the circumstances described above would go far to resolving the tension between limiting review to the administrative record and ensuring that

ERISA benefits determinations retain a firm link to the objective merits of the beneficiary's claim. Therefore, despite *Pinto*'s footnote eight, and even though the Court agrees with defendant that the record before the Court on the underlying benefits determination must be limited to that which was before the administrator. The parties should be aware that remand is a procedural step to be considered in the Court's adjudication of this matter.

**5. The nature of the trial to be held in this matter.**

For the foregoing reasons, the Court anticipates holding a trial on this matter at which it will accept whatever admissible evidence the parties may offer that is relevant to whether the benefits administrator acted under a conflict of interest. What standard of review should be applied to the administrator's determination as to the merits will be decided based upon the Court's assessment of the conflict evidence and the documentary evidence already part of the record of this matter.

Once the correct standard of review has been finally determined, whether the administrator's decision survives that review will be determined upon the administrative record. The Court does not agree with defendant's contention that because there is no dispute over the contents of this record, that summary judgment is appropriate. As the Ninth Circuit observed in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir.1999), *cert. denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999), summary judgment on a fixed record and a plenary determination of fact, even on that same record, are different. With respect to its review of the administrator's decision, the Court anticipates adopting the procedure set forth in *Kearney* and making plenary findings of fact pursuant to Federal Rule of Civil Procedure 52, even though no new evidence may be received on that branch of the case. Whether, as defendant further suggests, a hearing with oral arguments of counsel need be held as part of that Rule 52 proceeding, will be decided at a later date.

**CONCLUSION**

For the foregoing reasons, the application for leave to file a motion out of time to clarify or reconsider the Opinion and Order of November 8, 2000, will be granted. The Opinion and Order of November 8, 2000 will be vacated and replaced with this Opinion and the Order filed herewith.

The defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment will be denied. Discovery in this matter shall proceed in a manner consistent with this Opinion, as follows:

1. The Court will permit discovery of evidence relevant to the existent or the extent that the decision regarding plaintiff's entitlement to benefits was affected by a conflict of interest or bias.

2. No discovery may be had of evidence relevant to issues underlying plaintiff's entitlement to benefits, such as for example, evidence relating to plaintiff's medical condition.

3. Evidence discoverable under the preceding paragraph 1, shall not be deemed non-discoverable on the ground that it is also included within the provisions of the preceding paragraph 2.

An appropriate Order is attached.

**ORDER**

In accordance with the Court's Revised Opinion filed herewith,

It is on this 8th day of February, 2001,

ORDERED that the application for leave to file a motion out of time to clarify or reconsider the Opinion and Order of November 8, 2000, is granted; and it is further

ORDERED that this Court's Opinion and Order of November 8, 2000 are vacated and replaced with the Revised Opinion and this Order; and it is further

ORDERED that the defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment are denied; and it is further

ORDERED that discovery in this matter shall proceed in a manner consistent with the Revised Opinion, as follows:

1. The Court will permit discovery of evidence relevant to the existent or the extent that the decision regarding plaintiff's entitlement to benefits was affected by a conflict of interest or bias.

2. No discovery may be had of evidence relevant to issues underlying plaintiff's entitlement to benefits, such as for example, evidence relating to plaintiff's medical condition.

3. Evidence discoverable under the preceding paragraph 1, shall not be deemed non-discoverable on the ground that it is also included within the provisions of the preceding paragraph 2.