

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-2003

# Lasser v. Reliance Standard

Precedential or Non-Precedential: Precedential

Docket No. 02-4123

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Lasser v. Reliance Standard" (2003). *2003 Decisions.* Paper 228.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/228

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 18, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-4123

STEPHEN P. LASSER

v.

RELIANCE STANDARD LIFE
INSURANCE COMPANY,

Appellant

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 99-cv-04131)
District Judge: Honorable Alfred M. Wolin

Argued April 24, 2003

Before: SCIRICA,* Chief Judge, AMBRO and
GARTH, *Circuit Judges*

(Opinion filed September 18, 2003)

Joshua Bachrach, Esquire (Argued)
Rawle & Henderson
One South Penn Square
The Widener Building
Philadelphia, PA 19107

*Attorney for Appellant*

---

* The Honorable Anthony J. Scirica became Chief Judge on May 4, 2003.

Lewis Stein, Esquire (Argued)
Nusbaum, Stein, Goldstein,
 Bronstein & Kron, P.A.
20 Commerce Boulevard
Succasunna, NJ 07876

*Attorney for Appellee*

---

**OPINION OF THE COURT**

---

AMBRO, *Circuit Judge*:

Reliance Standard Life Insurance Company argues that the District Court incorrectly held arbitrary and capricious its determination that Stephen Lasser was not disabled within the terms of his disability insurance policy. We conclude that the Court did not err and therefore affirm.

## I.  Background

Dr. Stephen Lasser is an orthopedic surgeon who was employed by Townsquare Orthopedic Associates ("Townsquare"), a four-doctor practice group. He sued to obtain disability benefits he alleges Reliance Standard Life Insurance Company ("Reliance") owes him under the disability insurance policy Townsquare purchased from Reliance (the "Policy"). The Policy pays disability benefits when, because of injury, illness or disease, a claimant "is capable of performing the material duties of his/her regular occupation on [only] a part-time basis or [only] some of the material duties on a full-time basis."

Dr. Lasser suffers from coronary artery disease. In 1986, at age 46, he underwent coronary bypass surgery. As later became apparent, the surgery was not correctly performed.[1]

---

1. Rather than performing an artery graft, Lasser's surgeon conducted a vein graft procedure. Whereas artery grafts have a relatively high success rate, vein grafts have a significant failure rate — according to Lasser's physicians, between 50% and 60% after ten to fifteen years. Moreover, Lasser's vein graft, rather than being connected to another artery (as it should have been), was sewn to two diagonal branches, only one of which was supplying blood to the anterior descending artery.

Although Dr. Lasser did not experience symptoms for the next decade following the 1986 surgery, in 1996 he suffered a myocardial infarction (colloquially, a "heart attack"). Dr. Robert Aldrich, Lasser's treating physician, prescribed a treatment regimen of change of diet, exercise, and drug therapy. Dr. Aldrich also advised Lasser to reduce his stress level, including work-related stress. Accordingly, in September 1996 Dr. Lasser returned to work on a reduced schedule. He decreased his patient load by 50%, he was no longer "on-call" at night or on weekends, and he did not perform emergency surgery. On December 26, 1996, Reliance approved Dr. Lasser's application for long-term disability benefits under the Policy.

However, in December 1997, after a periodic review of Dr. Lasser's condition — and primarily in response to a medical evaluation issued by Dr. William Burke, whom Reliance hired to evaluate Dr. Lasser — Reliance terminated Lasser's benefits on the ground that he was not disabled as defined by the Policy. Dr. Lasser invoked Reliance's administrative appeal procedures, which prompted Reliance to obtain two additional medical opinions — from Drs. Karel Raska and John Field — as well as to commission a labor market survey to determine the material duties of Dr. Lasser's general occupation. Based on these medical opinions and the survey — as well as the fact that Dr. Lasser returned to work at a full-time schedule (including on-call and emergency surgery duties) — in April 1999 Reliance concluded that Dr. Lasser was not disabled from performing the material duties of his occupation and affirmed its earlier denial of benefits.

Dr. Lasser then filed a complaint in the District Court. In a February 8, 2001 opinion, it denied both parties' cross-motions for summary judgment and stated that it would hold a hearing to determine the proper standard of review.[2]

_____

2. The Court's stated basis for denying summary judgment was that "a court could find for either party when considering the administrator's resolution of these factual questions under the heightened standard of arbitrary and capricious review," and that "the parties have advanced to the Court some factual support for each of their positions on the underlying merits of the claim as well as on the extent to which the

*Lasser v. Reliance Standard Life Ins. Co.*, 130 F. Supp. 2d 616, 630 (D.N.J. 2001). After holding that hearing and deciding that a moderately heightened arbitrary and capricious standard of review was appropriate, the Court reviewed the record before Reliance. On the basis of its review, it held Reliance's determination of nondisability arbitrary and capricious and that Dr. Lasser was entitled to benefits. Reliance appeals.

## II. Jurisdiction

The insurance policy at issue is covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Dr. Lasser sued to recover benefits under the Policy, and ERISA preempts state-law claims in this context. *Id.* § 1132(a). Thus, the District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We exercise appellate jurisdiction under 28 U.S.C. § 1291.

## III. Standard of Review

The standard-of-review inquiry is more involved in this case than in most. The Supreme Court has mandated that courts review under the arbitrary and capricious standard claim denials in ERISA cases if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "Under the arbitrary and capricious standard, an administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law [and] the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d

---

administrator's decision was tainted by his self interest." *Id.* at 626-27. Our dissenting colleague suggests that the District Court erred by considering extra-record evidence in resolving the merits. We disagree. The District Court recognized that its review was limited to the record before the claims administrator. *Id.* at 630.

377, 387 (3d Cir. 2000) (internal quotation marks omitted). Here both parties agree that the Policy grants Reliance such authority.

However, if the same entity that determines whether a claimant is disabled must also pay for disability benefits, that entity has a financial incentive to find him or her not disabled. Thus, we have noted that, when the insurer of an ERISA plan also acts as a claims administrator, there is a structural or inherent conflict of interest that mandates a "heightened" arbitrary and capricious standard of review. *Id.* at 378. In *Pinto* we employed a "sliding scale" approach in which the level of scrutiny applied to the fiduciary's decision is "a range, not a point." *Id.* at 392 (quoting *Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992)). It is "more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is." *Id.* at 392-93.

The District Court held a hearing on the extent of Reliance's conflict of interest to determine the standard of review. Because the Court found no evidence of conflict other than the inherent structural conflict, it held that the correct standard of review was "at the mild end of the heightened arbitrary and capricious scale," and thus afforded a "moderate degree of deference" to Reliance's determinations. Neither party disputes this conclusion on appeal. However, Reliance argues that the District Court misapplied the standard by not deferring to Reliance's allegedly reasonable conclusions.[3]

---

3. The dissent criticizes the District Court for making *de novo* findings of fact on the basis of the Ninth Circuit's decision in *Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999), and notes that our Court has never adopted the *Kearney* approach. We agree with the dissent that *Kearney* is not the law in our Circuit and that *de novo* factfinding is improper in reviewing a claims administrator's decision under the arbitrary and capricious standard of review. But we do not believe that the District Court's reference to, and implicit endorsement of, *Kearney* constituted reversible error, for its reference to facts was explicitly "limited to that evidence before the claims administrator." 146 F. Supp. 2d at 621.

## IV. Discussion

### A. Dr. Lasser's Regular Occupation

Under the explicit terms of Dr. Lasser's Policy, he is disabled, *inter alia*, if as a result of injury, illness or disease he is capable only "of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis." To determine whether Reliance correctly decided that Dr. Lasser did not qualify for disability benefits, we first determine what is his "regular occupation," as the Policy leaves this term undefined. Reliance argues that "regular occupation" is broad, indeed generic. In initially denying Dr. Lasser benefits in December 1997, Reliance said that "regular occupation is not your job with a specific employer, it is not your job in a particular work environment, nor is it your speciality in a particular occupational field. In evaluating your eligibility for benefits, we must evaluate your inability to perform your own or regular occupation as it is performed in a typical work setting for any employer in the general economy."

We recognize that, if the meaning of "regular occupation" is ambiguous, Reliance's definition is entitled to deference under the applicable arbitrary and capricious standard of review. *Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167, 177 (3d Cir. 2001) (insurer's interpretation of an ambiguous insurance provision is entitled to deference unless it is contrary to the plan's plain language). However, we believe that "regular occupation" is not ambiguous. The Policy states that it protects the insured from inability to "perform the material duties of his/her regular occupation." Both the purpose of disability insurance and the modifier "his/her" before "regular occupation" make clear that "regular occupation" is the usual work that the insured is actually performing immediately before the onset of disability. Applying the text as written, Dr. Lasser's regular occupation was as an orthopedic surgeon responsible for emergency surgery and on-call duties in a relatively small practice group and within a reasonable travel distance from his home in New Jersey.

Even assuming "regular occupation" is susceptible to multiple interpretations and therefore ambiguous,

Reliance's definition of the term nonetheless must be reasonable before deference is conferred. *See Skretvedt*, 268 F.3d at 177 (noting that courts defer to a claims administrator's interpretation if it is not arbitrary or capricious). Yet Reliance's definition is different from that in the caselaw pertaining both to it and disability policies containing the "regular occupation" modifier. *See O'Bryhim v. Reliance Standard Life Ins. Co.*, 188 F.3d 502 (Table), 1999 WL 617891 (4th Cir. 1999) (unpublished *per curiam*) (on arbitrary and capricious review, holding that claimant could not perform material duties of his regular occupation and defining "regular occupation" with reference to specific duties performed for his employer).

Even were a court not to limit itself exclusively to the claimant's extant duties, that person's "regular occupation" nonetheless requires "some consideration of the nature of the institution [at which the claimant] was employed." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 253 (2d Cir. 1999). Moreover, *Kinstler* adopted the reasoning of an earlier district court case, *Dawes v. First Unum Life Insurance Co.*, 851 F. Supp. 118, 122 (S.D.N.Y. 1994), which defined "regular occupation" as "a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Id.* at 122. Notably, *Dawes* was decided before Dr. Lasser applied for disability benefits.

The plain meaning of "regular occupation" is one of which both parties were aware when the Policy began on June 1, 1993. There is no reason to believe that Dr. Lasser was aware of Reliance's different definition until it denied him benefits in December 1997. Because Reliance has shown no intent to "opt out" of this plainly understood term (indeed, it had the opportunity to do so each June when the Policy came up for renewal), it is unreasonable for it to argue it has done so *post hoc*. Even if we fall back to the interpretation of "regular occupation" imparted by *Dawes* and *Kinstler*, it too undermines Reliance's generic understanding. *Compare also Gaines v. The Amalgamated Ins. Fund*, 753 F.2d 288, 290 n.5. (3d Cir. 1985) (deferring to a plan administrator's construction of an ERISA-governed insurance policy when there was no caselaw

interpreting the provision at issue); *Epright v. Envtl. Res. Mgt., Inc. Health & Welfare Plan*, 81 F.3d 335, 340 (3d Cir. 1996) (holding a plan construction unreasonable when, among other deficiencies, the administrator pointed to no statutory provision to interpret the term and when its definition seemed self-serving).

In this context, it is unreasonable for Reliance to define "regular occupation" differently from its plain meaning or even the somewhat more relaxed understanding of *Dawes* and *Kinstler* without explicitly including that different definition in the Policy.[4]

## B. Material Duties of Dr. Lasser's Regular Occupation

Having determined that Dr. Lasser's regular occupation under the Policy was that of an orthopedic surgeon in a four-person practice group in New Jersey, and that it was unreasonable for Reliance *post hoc* to argue that the Policy's plain language was otherwise, we turn to what Dr. Lasser did in the course of his regular occupation. He saw patients during office hours, performed scheduled surgeries, took night call, and performed emergency surgeries. When he no longer handled night call and emergency surgeries, were they material? The District Court answered yes. 146 F. Supp. 2d at 641.

The Court's conclusion is supported by comparing Dr. Lasser's pre-disability earnings with his post-disability earnings from a reduced schedule. The Townsquare shareholders' agreement requires reduction by one-third of a doctor's salary when he or she no longer takes night call. Moreover, Dr. Lasser's salary was, on average, approximately $26,000 per month when he was performing all duties, but fell to between $4,000 and $6,000 per month immediately before Reliance terminated benefits. During this latter period, however, Dr. Lasser was working less than forty hours per week, as he reduced his patient load by one-third and no longer was operating in the afternoon after seeing patients in the morning. Even assuming he was working twenty hours per week instead of forty (an

---

4. As noted below, the generic *ex post* interpretation of Reliance is even at odds with the majority of survey responses solicited by Reliance.

assumption supported by record evidence), and assuming that he would have made $8,000 to $12,000 per month had he worked forty hours per week (*i.e.*, double his twenty-hour-per-week earnings), it stands out that, by not performing on-call or emergency surgery duties, Dr. Lasser's earnings have declined by over 50%. This substantial earnings decline lays out as little else can the materiality of those activities to his regular occupation.

Looking at the occupation of an orthopedic surgeon generically without reference to Dr. Lasser's particular duties, Reliance commissioned a labor market survey to determine whether performing emergency surgery and being on-call are material duties for an orthopedic surgeon.[5] The survey asked:

> In general, in your experience is it reasonable that an Orthopedic Surgeon can practice in this field if one:
>
> [1.] Cannot perform "on-call" duties, do night calls, or carry a pager[;]
>
> [2.] Cannot perform emergency surgery (even if one can do non-emergency, elective surgery)[;]

5. Reliance also consulted the Dictionary of Occupational Titles ("DOT") to aid its analysis. It points out that the DOT contains no separate listing for an orthopedic surgeon, which appears as an undefined related title under the "surgeon" heading. Therefore, applying the definition of surgeon, which does not refer to on-call and emergency duties, Reliance argues that these duties are immaterial. We agree with the District Court that the DOT's silence about this critical issue makes the DOT unhelpful and thus, to the extent that Reliance's conclusion is based on the DOT's definition of surgeon, that conclusion is unreasonable.

Ironically, in arguing that Dr. Lasser's duties should be evaluated with reference to the surgeon title in the DOT, Reliance acknowledged that surgery — rather than orthopedics — is the broader "occupational field" in which Dr. Lasser conducts his "regular occupation." However, in relying on the survey to find Dr. Lasser not disabled, Reliance must have concluded that his "occupational field" is orthopedics rather than orthopedic surgery — *i.e.*, that his "regular occupation" is one in which it is reasonable to conduct an office practice only or write reports, which some of the survey respondents suggested as available options. Reliance's inconsistency in position renders its ultimate disability decision even more suspect.

> [3.] If you have responded YES to either, can you estimate in your experience the appx. prevalence of such jobs for an orthopedic surgeon in the general economy where one would not need to perform "on-call" or perform emergency surgery duties?

Reliance's vendor sent 100 surveys, to which it received fourteen responses, only nine of which were returned in time to be considered. Five of those nine respondents opined that an orthopedic surgeon could "practice in this field" without performing on-call or emergency surgery duties. On the basis of the survey, and on the absence of any affirmative showing from Dr. Lasser that performing emergency surgery and being on-call are material duties of an orthopedic surgeon generally, Reliance concluded that these duties are immaterial, thereby precluding Dr. Lasser from disability benefits within his Policy's terms.

While Reliance selected survey responses to argue that on-call and emergency surgery duties were not material for Dr. Lasser, we (like the District Court) conclude that Reliance's survey actually favors Dr. Lasser's argument that these duties are material even on a generic basis.[6] When all fourteen responses are considered and when the respondents' comments are viewed along with the answers to the yes/no questions, the survey indicates that performing emergency surgery and being on-call are material duties of an orthopedic surgeon. Eight out of fourteen responses suggest that practice without these duties would be impossible or would result in an occupation fundamentally different from orthopedic surgery. One respondent wrote that the practice Reliance proposed would be very unusual and would essentially be a non-operative practice. Another stated that "[t]he only jobs that I know of that would fulfill your restrictions would be someone who restricted themselves [sic] to writing reports. Work-comp. or med-legal." A third respondent

---

6. And given that doctors will inevitably have less scheduling flexibility when they work in smaller rather than larger practice groups, it seems only reasonable to conclude that the survey would have been even *more* favorable to Lasser had it taken into account the relevant context of his practice at Townsquare.

noted that "[i]n your example, you are describing a physician who is not an orthopaedic surgeon, but might be considered an orthopaedist. An orthopaedic surgeon should be able to fulfill all duties." Five other respondents flat-out said that what Reliance proposed was impossible.

In this context, both Dr. Lasser's particular case and the survey for orthopedic surgeons in general lead to the conclusion that on-call and emergency surgery duties were material to his regular occupation.

## C. Ability of Dr. Lasser to Perform the Material Duties of His Regular Occupation

### *1. Merits*

We next determine whether Dr. Lasser's medical condition precludes him from safely performing material duties of his regular occupation. He argues that he cannot safely perform emergency surgery or perform on-call duties. To fulfill our appellate review function under the arbitrary and capricious standard, we examine the entire record to determine whether Reliance's determination is supported by substantial evidence. *Pinto*, 214 F.3d at 387.

Reliance's primary motivation for discontinuing Dr. Lasser's benefits in December 1997 appears have been a report issued by Dr. Burke. He examined Dr. Lasser, subjected him to a treadmill test in November 1997, and concluded that Dr. Lasser "does not demonstrate any cardiovascular disability."[7] During an earlier treadmill test performed by Dr. Steven Roth in April 1997, Dr. Lasser "achieved greater than 90% of age-predicted maximum [heart rate]" and experienced only "mild fatigue [after] 14 minutes." A nuclear cardiologist, Dr. Christos Christou, noted that planar imaging of Dr. Lasser's heart conducted during the cardiovascular testing revealed only a "very small and probably clinically insignificant" heart defect.

Furthermore, Reliance notes that Dr. Lasser's physician, Dr. Aldrich, considered Lasser to be in New York Heart

---

7. Dr. Burke described Lasser's prognosis as "excellent" with a "plaque stabilizing regimen" and "ace inhibitors to prevent the slight hypertensive response associated with exercise."

Association Functional Class II ("Patients with cardiac disease with slight limitation of physical activity. They are comfortable with mild exertion but experience symptoms with the more strenuous grades of ordinary activity.") and Therapeutic Class C ("Patients with cardiac disease whose ordinary physical activity should be moderately restricted and whose more strenuous efforts should be discontinued.") — classifications that do not suggest significant limitations on Dr. Lasser's ability to work as an orthopedic surgeon.[8]

Dr. Lasser, however, contends that Reliance's conclusion is unsupported by substantial evidence. He notes that, after appealing the discontinuation of his benefits, Reliance engaged two other physicians to evaluate him, both of whom issued reports supporting his position. The first, Dr. Raska, concluded that Dr. Lasser "should avoid stressful situations — i.e., those that require night call [and] medical emergencies," and that "[a] reduced stress work environment and schedule is absolutely necessary to maintain this patient's health." Dr. Raska reasoned that "[s]tress regardless of exercise tolerance is a recognized independent risk factor for recurrent coronary artery disease . . . [and that] there are multiple studies . . . which demonstrate that stress causes flux in the level of catecholamines in the circulation which have been shown to be a precipitant of acute myocardial infarction and sudden death." In Dr. Raska's opinion, Lasser's unsuccessful vein graft made stress reduction especially important, as increased stress could bring about even earlier failure of the graft. In this context, he opined that Dr. Lasser's disability benefits should not have been

---

8. Reliance also points out that Dr. Burke considered Lasser to be in Functional Class I ("Patients with cardiac disease but with no limitation of physical activity. Ordinary activity causes no undue dyspnea, anginal pain, fatigue or palpitation.") and Therapeutic Class A ("Patients with cardiac disease whose physical activity need not be restricted."). Dr. Raska said that Lasser was in Functional Class I and Therapeutic Class C.

revoked because he "cannot safely perform the material duties of an orthopedic surgeon."[9]

After receiving this report, however, Reliance realized that Dr. Raska had a conflict of interest: he practiced in the same physician group as a doctor from whom Dr. Lasser previously sought an evaluation, Dr. Lubow (whose evaluation is discussed below). In response, Reliance engaged Dr. Field as another evaluating physician. While Dr. Field noted that "[t]here is little definitive evidence that emotional or job stress is causally related to the development or acceleration of coronary artery disease," he did acknowledge that "both physical and emotional stress are identified triggers of acute myocardial infarction [heart attack]." He concluded that Dr. Lasser could work a forty-hour week, but "is not capable of resuming all of the customary duties and responsibilities of an orthopedic surgeon." In particular, Dr. Field opined that Lasser should restrict his on-call or emergency surgery duties, given their stressful nature.

Dr. Lasser also relies on the evaluation of his treating cardiologist, Dr. Aldrich, as well those of Drs. Barry Lowell and Lawrence Lubow, who all opined that he is disabled. First, Lasser argues that the evaluation issued by Dr. Aldrich suggests that he is incapable of working in his regular occupation. When Reliance asked Dr. Aldrich to complete a form detailing Dr. Lasser's "current restrictions and limitations," he responded that Lasser should "limit exposure to physical and emotional stress." He noted also that "[s]tress is a well-documented risk factor not only for

9. Moreover, Dr. Raska was sharply critical of Dr. Burke's evaluation, the basis of Reliance's initial decision to terminate benefits. While according to Dr. Burke Lasser underwent a treadmill stress test in which he exercised to Stage IV of the Bruce Protocol (the standard by which stress tests are typically conducted), Dr. Raska pointed out that Lasser was only on the treadmill for three minutes and thirty-six seconds, an insufficient duration for a patient to reach Stage IV. He also noted that Dr. Burke's examination of Lasser's records was "sloppy" because it described a heart catheterization occurring in October 1996, when in fact it was performed in July 1996. To Dr. Raska this error suggested that Dr. Burke was insufficiently familiar with Lasser's case to arrive at a reasoned evaluation of his condition.

the development of coronary artery disease itself, but within that context, to the precipitation of a myocardial infarction." As a result, in a letter to Reliance dated June 3, 1998, Dr. Aldrich expressed to Reliance that he believed Dr. Lasser is disabled and incapable of "resuming all of the customary duties and responsibilities of an orthopedic surgeon on a full-time basis[,] or at least that he could not do so without exposing himself to a high degree of risk." Dr. Aldrich's reasoning underlying this conclusion was that, even though "by all objective criteria Dr. Lasser is doing very well at this point in time," work-related stress might induce a deterioration in Dr. Lasser's condition. Moreover, according to Dr. Aldrich's reasoning, a favorable classification under the New York Heart Association guidelines is of limited use in Dr. Lasser's situation, as that classification system addresses a cardiac patient's ability to perform certain physical tasks without regard to stress.

Dr. Lowell, who performed a cardiac catheterization on Dr. Lasser, also opined that Lasser was disabled. He agreed with Dr. Burke that Lasser's "functional stress test at the present time is excellent," but cautioned that "the stress of his profession will contribute to poorer control of blood pressure and lipid therapies" and that "a less stressful environment would contribute to his graft longevity." Dr. Lowell concluded that "the severity of Dr. Lasser's heart condition, while not readily measured by traditional testing methods, renders him just as disabled as the patient whose disability would not be questioned because he presents with more overt symptoms."[10]

Finally, Dr. Lubow, a physician who examined Dr. Lasser at the request of Lasser's counsel, reached a conclusion similar to that of Drs. Aldrich, Raska, and Lowell. He opined that, "[b]ased on the recurrence of significant arteriosclerotic heart disease manifest[ed] by an acute infarction plus the need for urgent angioplasty and stenting after a ten year hiatus when he had no symptoms, the

---

10. He too criticized Dr. Burke's report for its failure to mention the "significant anatomic problems with Dr. Lasser's coronary anatomy."

decision to grant this patient permanent partial disability was certainly correct, particularly in view of his anatomy."[11]

Thus, all evaluating physicians — with the exception of Dr. Burke, whose report the others discredited — agreed that Dr. Lasser's heart condition precludes him from safely performing on-call duties and emergency surgery. Reliance's conclusion to the contrary thus is arbitrary and capricious. To the extent that Reliance's determination of nondisability was that "it was unreasonable . . . to expect Reliance . . . to simply accept the opinion [that stress would exacerbate Dr. Lasser's condition] without any range of the probability or actual proof that Dr. Lasser was at increased harm," we believe its determination was faulty.

### 2. Clarification Regarding Burden of Proof

We conclude with a clarification regarding the burden of proof in disability cases. While the burden of proving disability ultimately lies with Dr. Lasser, to require him to provide statistics detailing the harm that working in his regular occupation might precipitate — as the dissent would require — raises the bar too high.[12] Most disability claimants will not have the means at their disposal (financial or otherwise) to obtain this kind of evidence. Therefore, once a claimant makes a *prima facie* showing of disability through physicians' reports (as Dr. Lasser has done here through physicians' reports stating that stress will exacerbate his heart condition) and if the insurer wishes to call into question the scientific basis of those reports (as Reliance has attempted to do here), then the burden will lie with the insurer to support the basis of its objection. It has not met that burden here.

11. Like Drs. Aldrich, Raska, and Lowell, he also criticized the thoroughness of Dr. Burke's review, as well as the improper manner in which he conducted Lasser's stress test.

12. The dissent states that the risk that stress will cause future injury is insufficient to constitute a present disability. However, whether risk of future effects creates a present disability depends on the probability of the future risk's occurrence. While Lasser's doctors have not precisely quantified the risk in his case, their reports suggest that the risk is high. While of course stress does not *necessarily* incapacitate an individual (note, for example, Vice President Cheney), in Lasser's case his doctors have opined that stress is incapacitating.

**D.   Relevance of Alleged Resumption of Dr. Lasser's On-Call and Emergency Surgery Duties**

Reliance argues that, even if emergency surgery and on-call duties are material, Dr. Lasser's resumption of these duties settles whether he is disabled from performing them. We disagree. First, because Dr. Lasser disputes that he has resumed performing these duties with the same frequency as before 1996, this issue involves a factual question that we do not resolve on appeal. Moreover, even assuming the facts as Reliance has alleged them, Dr. Lasser's physicians — as well as Dr. Field, on whose opinion Reliance has placed much weight — have advised that he should not perform these duties. Thus, there is substantial medical evidence that, if Dr. Lasser is performing on-call and emergency surgery duties, he is doing so to his detriment. Indeed, Dr. Lasser has argued that, to the extent that he has resumed these activities, he did so out of economic necessity — because Reliance discontinued his benefits. A claimant's return to work is not dispositive of his or her disability when economic necessity compels him or her to return to work. *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) ("A desperate person might force himself to work despite an illness that everyone agreed was totally disabling."); *Levinson v. Reliance Standard Ins. Co.*, 245 F.3d 1321, 1326 n.6 (11th Cir. 2001) (a claimant's status as a full-time employee should not constitute reliable evidence that he is able to perform the material duties of his occupation on a full-time basis); *Stark v. Weinberger*, 497 F.2d 1092 (7th Cir. 1974) (even if a claimant returns to work, her doing so does not mean she is not disabled). This principle is especially persuasive here, where Dr. Lasser's disability was not observable and did not make it physically impossible for him to perform his job for a limited period.

\* \* \* \* \* \* \* \* \*

We hold that Dr. Lasser's "regular occupation" was that in which he was actually engaged immediately before becoming disabled: an orthopedic surgeon in a four-person practice group in New Jersey. We also hold that on-call and emergency surgery duties are material to Dr. Lasser's practice and that he is disabled from performing those

duties. We agree with the District Court that Reliance's conclusion to the contrary was unsupported by substantial evidence and therefore was arbitrary and capricious. We accordingly affirm the District Court's judgment in favor of Dr. Lasser.

GARTH, *Circuit Judge*, dissenting.

I am obliged to dissent from the majority's judgment in favor of Dr. Lasser.

(1) The District Court failed to adhere to our established standards of review and our precedents. *See Lasser v. Reliance Standard Life Ins. Co.*, 130 F. Supp. 2d 616, 630 (D.N.J. 2001) ("*Lasser I*") ("th[is] Court anticipates adopting the procedure set forth in *Kearney* [*v. Standard Ins. Co.*, 175 F.3d 1084 (9th Circuit 1999) (en banc)] and making plenary findings of fact pursuant to Federal Rule of Civil Procedure 52, even though no new evidence may be received on that branch of the case.")[1] By so doing, the District Court erred by giving only lip service, but no required true deference, to the Administrator Walsh's determinations even after it had held that the Administrator was neither conflicted nor biased. *See Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir. 2000).

(2) This is a summary judgment case. The District Court, when called upon to decide summary judgment, cannot hold a trial on the merits a la *Kearney*. *See infra* note 3. In this case, the District Court did just that.

(3) The District Court, at its truncated April 10, 2001 hearing, while purporting to resolve only the Administrator's status as to whether he was conflicted or biased (it held that he was neither), cannot proceed to ignore our prescribed standard of review which requires deference and then proceed to substitute its own judgment on the merits.

(4) The policy written by Reliance requires that for disability benefits, Dr. Lasser had to be disabled from performing the *material* duties of his regular occupation. The burden of proving materiality rested on Dr. Lasser. No evidence of materiality appears in the record.

(5) No deference was shown by the District Court to Mr.

---

1. The District Court filed two opinions in this case. On February 8, 2001, it filed *Lasser I*, 130 F. Supp. 2d 616, and on June 13, 2001, it filed *Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp. 2d 619 (D.N.J. 2001) ("*Lasser II*").

Walsh's, the Administrator's, determinations that: (a) materiality was not demonstrated; (b) Dr. Lasser returned to, and was performing, his full-time occupation; (c) "emergency" and "on-call" services were not established as material; yet, these were the only services Dr. Lasser was told not to perform; and (d) neither stress nor future disabilities could establish Dr. Lasser's *present* disability.

(6) The actions taken by Reliance and the evidence relied upon by Reliance, as well as the determinations made by Walsh, the Administrator, cannot be determined to be arbitrary nor capricious under our standards and precedents.

## I.

This appeal comes to us after both parties had moved for summary judgment. It has remained a summary judgment case in which the District Court could look only to the developed administrative record.

I begin by briefly outlining the pertinent procedural history. In its February 8, 2001 opinion, the District Court denied the parties' cross-motions for summary judgment. It then stated that it would hold a hearing to determine if Walsh, the Administrator, was biased or suffered a conflict because he was an employee of Reliance. *Lasser I*, 130 F. Supp. 2d at 625-26, 630 (referring to *Pinto*'s sliding scale of arbitrary and capricious review).[2]

The District Court then conducted a bench trial on April 10, 2001 where it heard only Walsh's testimony relevant to the issue of how heightened our standard of review should be on *Pinto's* sliding scale. Dr. Lasser did not testify, nor did any other witness. *I reiterate—the only purpose of the hearing was to address whether Walsh was conflicted or biased because he was Reliance's employee.* Walsh had the duty of determining a claimant's eligibility for benefits as well as of paying those benefits out of the funds from which

---

2. *Pinto* held that, "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." *Pinto*, 214 F.3d at 378.

Reliance reaps its profits. If biased, then under *Pinto* the deference to be accorded his determination would be less deferential, and the court must "calibrat[e] the intensity of [the] review to the intensity of the conflict." *Pinto*, 214 F.3d at 393. If not biased, then under *Pinto*, the standard of deference to be employed would be "deferential, but not absolutely deferential." *Id.* But, in either event, deference had to be accorded.

Thereafter, the District Court determined that it would give a "moderate degree of deference" to Walsh's determinations as it found no evidence of bias or conflict exhibited by Walsh. *Lasser II*, 146 F. Supp. 2d at 623.

At this stage, the District Court was required to end its inquiries and hearing and review the existing administrative record—and no more. But, the District Court did not do that. It proceeded further, despite the summary judgment context of the instant case, and it made its own findings of fact on the merits. *Id.* at 620, 642.

Under our precedents, district courts cannot conduct so-called "merits-trials" when determining the appropriate conflict-of-interest review standard.[3] As I have stated, the District Court should have limited its findings to a determination of what the appropriate standard of review would be, and then should have continued on to resolve the summary judgment question pursuant to that standard.

Accordingly, I would have returned this case to the District Court with the direction that it expunge all its merits findings and discussion and then proceed to perform its prescribed function of ruling, on the *administrative*

---

3. The District Court relied on a Ninth Circuit divided en banc case which, contrary to Third Circuit jurisprudence, required *de novo*, not deferential, review. *See Kearney*, 175 F.3d 1084. In *Kearney*, a lawyer with a heart condition who played several sets of tennis every weekend, car-raced up to 120 miles per hour and had medical opinions that he could return to work, contested the cessation of his disability policy payments. *Id.* at 1086. The District Court accorded *de novo* review and ruled in favor of the insurance company. *Id.* at 1086-87. A fractured en banc court reversed, approving *de novo* review but finding a material disputed fact. *Id.* at 1090, 1093.

record only, whether Walsh's denial of benefits was arbitrary or capricious.

## II.

Although the District Court purported to subscribe to the correct standard of review, a fair reading of the District Court's opinions indicates that it did not; it merely gave lip-service to the deference to be accorded to the Administrator's determinations.

Pursuant to the plain language of Reliance's policy, whether Dr. Lasser is "totally disabled" hinges on whether he can perform the "material" duties of his occupation. The relevant part of the policy provides:

> "Totally Disabled" and "Total Disability" mean . . . that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the *material* duties of his/her regular occupation . . . .

App. at 139 (emphasis added). Critical to this analysis, is that the burden to prove materiality is on Dr. Lasser because the burden of proving coverage is always on the claimant. *See Lasser II,* 146 F. Supp. 2d at 639 (citing *Pinto*, 214 F.3d at 394 n.8). Dr. Lasser, however, submitted no evidence, no proofs, no affidavits, no witnesses, and no depositions on the issue of materiality. Indeed, the record as to this issue is barren.[4]

---

4. The majority opinion seeks to answer its own question, which it has posed as, "When he [Dr. Lasser] no longer handled night call and emergency surgeries, were they material? The District Court answered yes." Maj. op. at 8. But, as I have pointed out, it was not the function of the District Court to make such a finding. Nor is it the function of this Court to uphold such a finding when it appears in a summary judgment context.

Rather, the majority should have examined the record, as I have, for evidence of materiality as to night calls and emergencies. Had the majority done so, it would have learned, as I did, that no such evidence exists—and it is that evidence that the Reliance policy requires.

Moreover, the burden of proof as to materiality rests with Dr. Lasser and the majority opinion's purported clarification respecting the burden of proof does not change that prescription. *See* maj. op. at 15.

Despite the silence of the record regarding materiality, the District Court nevertheless held that Dr. Lasser had made out his burden of proof on materiality. To do so, the District Court relied principally on the diminution of Dr. Lasser's income when he discontinued emergency and on-call duties. *Id.* at 639-40. The majority, too, finds this diminution in income to be controlling. Yet, it must be remembered that during the period of time (from September 1996 to December 1997) that Dr. Lasser was "totally disabled," he was attending to all his office functions and tasks and he was performing scheduled (elective) surgery. At the same time, he was collecting total disability benefits from Reliance.

The District Court also relied on the various medical reports from cardiologists, although they merely stated that Dr. Lasser should not perform "emergency" and "on-call" work—not that those functions were "material" to his occupation of orthopedic surgeon. *Id.*

Reliance, on the other hand, presented evidence on the issue of materiality. Reliance looked to the duties of a general surgeon as defined in the Dictionary of Occupational Titles ("DOT") from the United States Department of Labor. "Emergency" and/or "on-call" work are not included in material duties. Dr. Lasser has presented no evidence to the contrary.

Furthermore, the DOT is a recognized authority in the vocational industry. *See, e.g., Gallagher v. Reliance Life Ins. Co.,* 305 F.3d 264, 272-73 (4th Cir. 2002) (DOT is an objectively reasonable tool for determining the *material* duties of an occupation; a "general job description of DOT, to be applicable, must involve comparable duties but not necessarily every duty.") (emphasis added).

Similarly, the District Court gave no deference whatsoever to Reliance in its use of a labor market survey. This study provided direct evidence that "on-call" and "emergency" duties—the only restrictions which Dr. Lasser's physicians proscribed—were not material. Dr. Lasser provided no vocational studies nor, as I stated earlier, any other evidence which contradicted Reliance's evidence on materiality.

Moreover, the use of such vocational studies in eligibility for disability benefits is an accepted practice in this Circuit. *See, e.g., Russell v. Paul Revere Life Ins. Co.*, 288 F.3d 78, 79, 82 (3d Cir. 2002) (labor market study which identified jobs within the claimant's occupation that did not require travel, contravened plaintiff's contention that he remained disabled because he could not work extended hours and travel, which his current position required).

All of this evidence stands unrebutted by Dr. Lasser. Again, the appropriate standard of review is whether or not Reliance was arbitrary and capricious in determining that Dr. Lasser *failed to meet his burden of materiality*, that is: that Dr. Lasser could not perform the material duties of his regular occupation. Nowhere in this record is there evidence that "emergency" and "on-call" tasks—the only work which Dr. Lasser was told he could not perform—are material to Dr. Lasser's every day occupation. Although I am sympathetic to Dr. Lasser's financial and medical difficulties—as I am sure the members of the majority are too—such sympathy cannot substitute as evidence that "emergency" and "on-call" work are *material* to the occupation of an orthopedic surgeon.

Furthermore, I find it troubling that Dr. Lasser presented no vocational study, nor any evidence from experts in the field, or even evidence from the members of his own office or himself, to support his contention that these tasks were in fact material. In particular, there has been no evidence as to whether his three partners could handle and would respond to the practice's on-call and emergency duties, although such circumstances could lead to a diminution of income for Dr. Lasser. There was also no evidence in the record that Dr. Lasser could not perform scheduled elective surgery, as well as all other office procedures and tasks.

## III.

The majority, I sense, has fallen into the same pattern of analysis employed by the District Court. Instead of addressing and assessing the basis, the rationale and the evidence which led to the Administrator's determination denying benefits, and then giving appropriate deference to

that determination, the majority discusses the evidence as if it was subjected to *de novo* review after trial. In doing so, it draws its own conclusions and substitutes its own judgment as to who and what is to be believed.

Instead of looking to the *evidence* of materiality—(there is none)—or the evidence of whether "emergency" and "on-call" procedures are material—(the evidence is uncontradicted that they are not)—the majority opinion reviews the District Court record as if it arose from a non-jury fact-finding trial. That, I suggest, was the error the District Court fell into and it is compounded by the majority of this panel.

I also find that the majority's preoccupation with the definition of "regular occupation" misses the mark. Here, we are concerned only with the *policy's* definition of "total disability" which concentrates on *material* aspects of Dr. Lasser's practice. The majority relies on the Second Circuit's decision in *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243 (2d Cir. 1999), even though that case is distinguishable inasmuch as the standard of review there, unlike here, was *de novo.* The majority further strains to justify the term "regular occupation" by relying on a Fourth Circuit unpublished opinion, *O'Bryhim v. Reliance Standard Life Ins. Co.*, 188 F.3d 502 (Table), 1999 WL 617891 (4th Cir. 1999) (unpublished *per curiam*). *See* maj. op. at 7. A Fourth Circuit unpublished opinion under no circumstances can be considered precedential by this Court. In doing so, the majority opinion ignores the claim evaluation framework established by the very language of the Reliance policy that it quotes: First, the claimant's condition is evaluated. Next, the claimant's regular occupation is evaluated and the material duties thereof are defined. Finally, the claimant's condition is compared against the material duties determined to be required in his regular occupation. It appears that Dr. Lasser, the District Court, and now this Court would end the inquiry after just the first step.

## IV.

Another example of the District Court's failure to defer to Walsh's determinations revolves around Dr. Lasser's

continuing to work while receiving disability payments of about $6,000 a month, as well as Dr. Lasser's return to work after his benefits were discontinued.

Reliance argues that Dr. Lasser cannot be totally disabled because in December 1997 he returned to "full-time" unrestricted work, *including* "emergency" and "on-call" duties, without consequence to his health. *See* App. at 263. Reliance further contends that it was reasonable because none of the doctors stated that he would be incapable of performing a full-time schedule and Drs. Burke and Field specifically evaluated Dr. Lasser as being capable of full-time work.

The District Court concluded, and the majority here agrees, that because Dr. Lasser risked *future* heart attacks due to the *stress from on-call and emergency duties*—which on this record cannot be characterized as material—his continuing to work after the termination of his insurance benefits nevertheless is evidence of his "total disability." In particular, the District Court focused on the fact that he risked his health, against the express recommendations of his doctors, by returning to those duties out of economic necessity. *Lasser II,* 146 F. Supp. 2d at 626 n.5, 627, 630. But, without satisfying the policy's condition of inability to perform tasks material to his occupation, I cannot agree that Dr. Lasser, who was working in his office and performing elective surgery, was "totally disabled."

The Eighth Circuit has addressed this issue of relating economic necessity to total disability in a context similar to Dr. Lasser's. In *Galman v. Prudential Ins. Co. of America,* 254 F.3d 768 (8th Cir. 2001), the Eighth Circuit held that a claimant cannot assert total disability when he has returned to work, regardless of whether he returned to work out of "economic necessity" after an initial denial of benefits while awaiting the results of his administrative appeal. *Galman,* 254 F.3d at 771-72. Galman was a trial attorney who suffered from coronary artery heart disease, with a history of, *inter alia*, two prior heart attacks. He based his disability claim, in part, on the risk of aggravating his heart condition due to the stress of work. After the claim was denied, Galman returned to work full time asserting that the denial "forced him to return to work

for financial reasons." *Id.* at 771. The court rejected his claim for benefits. *Id.* at 772.

The majority implies that Dr. Lasser was unable to work a forty-hour week, and thus was disabled. But the majority misapprehends our jurisprudence. An insurer is not arbitrary and capricious merely because it relies on other medical opinions that result in a denial of coverage; it is only arbitrary if such decision was "clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 41 (3d Cir. 1993); *see also, e.g., Orvosh v. Program of Group Ins. for Salaried Employees,* 222 F.3d 123, 129 (3d Cir. 2000); *Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148-49 (7th Cir. 1998) (a plan's decision, if reasonable, must be affirmed even if the claimant presents an opposite position). Here, Reliance has fully complied with all established procedures and the Administrator's record is replete with evidence supporting the Administrator's decision.

## V.

Moreover, the District Court's and the majority's reliance on the issue of "stress" does not do credit to their analyses.

Once again, I consider the evidence from the administrative record through the lens of deference. Under this deferential standard, it is clear that the District Court, and then the majority, erred.

First, it is undisputed that none of the doctors who supported the disability claim ever stated with any degree of medical certainty the increased risk to Dr. Lasser of returning to full-time employment. Reliance's policy does not insure against *future* disability—only *present* disability. A doctor or other expert who determines that a patient is disabled based on the possible *future* effects of stress should have to quantify that risk so that the ERISA decision maker can determine if it constitutes a present disability. Thus, an opinion that Dr. Lasser's venous graft may not survive another five years does not satisfy the condition of Reliance's disability policy—a policy which requires that Dr. Lasser be unable to perform the material

duties of his occupation at this time. To illustrate: I, as a judge, may go blind in five years—but if I am not blind *now*, that possibility cannot be deemed to render me *presently* disabled.

I think we all recognize that stress, while it may affect cardiac patients, does not necessarily incapacitate them, or prevent them from successfully returning to, and performing, stressful jobs, i.e., Vice President Dick Cheney. *See, e.g., Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 796, 798-99 (8th Cir. 2002) (plan not arbitrary and capricious in denying benefits, even where the claimant's doctor declared him disabled based on the exacerbating factor of stress); *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 335 n.8 (5th Cir. 2001) (dismissing claimant's complaint that his insurance company failed to account for his doctor's concern of the stress associated with his job).

Based on the administrative record, it was not arbitrary and capricious for Reliance to determine that Dr. Lasser was not "disabled" based on any risk of relapse from stress. Indeed, stress tests subsequent to his heart attack in July 1996 did not reveal any chest pain or EKG abnormalities during cardiac testing, only a "very small myocardial infarction" which was "very small and probably clinically insignificant." App. at 208. Three cardiologists rated Dr. Lasser at a Functional Class I level for physical capacity on the New York Heart Association Functional Classification System, which level designates "[p]atients with cardiac disease but with no limitation of physical activity." *Lasser II*, 146 F. Supp. 2d at 626. Dr. Aldrich's March 25, 1998 report states: "I do not disagree [with Dr. Burke] that by all objective criteria Dr. Lasser is doing very well at this point in time" and also reports that Dr. Lasser "does not currently have any symptoms, his examination is negative with respect to the cardiovascular system, and his stress test from April of 1997, as well as the stress test performed by Dr. Burke showed good exercise capacity . . . ." App. at 222. Dr. Raska's August 5, 1998 report confirmed Dr. Lasser's cardiovascular fitness as "excellent," his cardiac condition as stable and further stated that patients with a New York Heart Association Functional Class I level

typically have "an overall low risk of cardiovascular morbidity or mortality." App. at 229.

## VI.

I believe that the District Court should have determined, on the *established administrative record*, whether the Administrator abused his discretion and was arbitrary and capricious in determining at least the following matters:

(a)  Did Dr. Lasser meet his burden of establishing the material tasks and aspects of his practice?

(b)  Are emergency surgeries and on-call duties material parts of Dr. Lasser's functions as an orthopedic surgeon?

(c)  Could and did Dr. Lasser perform elective (scheduled, not emergency) surgery as *material* procedures of his occupation?

(d)  Could Reliance's policy as drawn take into account future disabilities that Dr. Lasser may suffer or was it limited to only the current or present disability which Dr. Lasser may or may not have?

It is these matters with which the District Court had to concern itself in determining whether the Administrator's denial of benefits was arbitrary and capricious. By failing to do so, I believe the District Court erred.

One last word on this subject. I am troubled by the District Court's reliance on the Ninth Circuit's *de novo* standard in *Kearney*. *See supra* note 3. While *Kearney* may have its advocates, and I cannot help but note that the Ninth Circuit en banc court was severely divided, we have yet to depart from established review standards in ERISA and summary judgment cases. To my mind, the District Court's abrogation of both these standards in favor of a *Kearney* review, rings a warning bell that cannot be ignored.

Had the District Court conducted its hearing as I suggested it should, that is, confining itself only to the resolution of whether Walsh was conflicted or biased, and had the District Court then resorted to the traditional summary judgment resolution based only on the record

below, I would not have raised this issue. But this is not the way this case played out, as I have noted. If we permit the review that took place in this case, I fear it will signal to district courts in the future that they are free, in similar cases, to hold merits hearings and thus to deviate from the summary judgment and *Pinto* standards.

Thus, in sum, I would reverse the District Court's judgment in favor of Dr. Lasser and remand for the District Court to properly consider this case under the summary judgment standard, giving *Pinto* deference to Walsh's determinations. As the Supreme Court just recently noted, a court must *actually apply* the correct standard; *mere lip-service and mere citation* to a standard of review will not suffice. *See Price v. Vincent*, 123 S. Ct. 1848, 1852 (2003) (holding that the Sixth Circuit recited the correct standard of review under 28 U.S.C. § 2254(d)(1) but then did not apply it when it reviewed the double jeopardy question at issue.)

Thus, I respectfully dissent.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*