**Alexan ABDEL–MALEK, M.D., Plaintiff,**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, et al., Defendants.**

**No. 03–7542–PLA.**

United States District Court, C.D. California, Western Division.

March 2, 2005.

Glenn R. Kantor, Corinne Chandler, Gruber & Kantor, Sherman Oaks, CA, for Plaintiff.

Keith M. Parker, Smith Silbar Parker & Woffinden, Irvine, CA, for Defendants.

## MEMORANDUM OPINION AND ORDER

ABRAMS, United States Magistrate Judge.

### INTRODUCTION

On October 22, 2003, plaintiff Alexan Abdel–Malek, M.D. ("plaintiff") filed a Complaint against defendants Life Insurance Company of North America ("LINA") and Southern California Permanente Medical Group Long Term Disability Insurance Plan (the "Plan"). Plaintiff alleges that defendants unlawfully terminated his long term disability benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. Defendants answered the Complaint on November 24, 2003.

On April 26, 2004, the parties consented to proceed before the undersigned Magistrate Judge. A bench trial was held on September 10, 2004. Having considered the evidence and the parties' arguments, the Court concludes as follows.

### PROCEDURAL ISSUES

The parties stipulated that the standard of review to be employed by the Court in reviewing the propriety of defendants' decision concerning plaintiff's claim is *de novo*. They also stipulated to the admission of ten exhibits for the Court to consider in resolving this matter. *See* Stipulation Regarding Standard of Review and Joint Submission of Exhibits, filed July 19, 2004 ("Stipulation"). No further evidence or testimony has been provided to the Court. Consequently, the Court's review is limited to the ten exhibits attached to the Stipulation.

### FACTUAL BACKGROUND

#### A. THE PLAN

Plaintiff is a staff physiatrist who works at and is a partner of Southern California Permanente Medical Group ("Permanente"). He has worked at Permanente since 1983. As a partner physician, plaintiff is a participant in Permanente's Long Term Disability Insurance Plan, an employee welfare benefit plan governed by ERISA. Benefits under the Plan are insured by a group policy (the "Policy") issued by defendant LINA to Permanente. *See* Stipulation, Ex. 8 at p. 40, ¶ A; Ex. 9.

The Plan defines total disability as the inability to perform all of the material duties of the participant's regular occupation or the inability to earn 80% of the participant's pre-disability income indexed for inflation. After 60 months of disability payments, the Plan defines total disability as the inability to perform all of the material duties of any occupation or the inability to earn 80% of the participant's pre-disability income indexed for inflation. Stipulation, Ex. 9 at p. 57.

#### B. PLAINTIFF'S ILLNESS

On April 4, 2000, plaintiff experienced chest pain. Tests revealed significant blockage of his coronary arteries. On April 7, 2000, plaintiff underwent success-

ful single bypass surgery. Stipulation, Ex. 8 at p. 40, ¶ B.

Plaintiff returned to work on a part-time basis in July, 2000, at 80% of his prior work-load. Plaintiff's claim for partial disability benefits was approved by LINA in December, 2000, retroactive to October 1, 2000. *Id.* at ¶¶ B–C.

On April 17, 2001, LINA terminated plaintiff's benefits, concluding that plaintiff was capable of full-time work. Stipulation, Ex. 8 at p. 40, ¶ C. Plaintiff timely appealed, relying on a letter from his treating physician who opined that plaintiff was at risk for a future heart attack. Stipulation, Ex. 1 at p. 3; Ex. 8 at p. 40, ¶ C. LINA denied plaintiff's appeal on October 1, 2001. Stipulation, Ex. 8 at p. 40, ¶ C.

## C. PLAINTIFF'S CLAIMS

Plaintiff filed suit and the parties mediated the case before a private mediator. As a result of the mediation, the parties entered into a Settlement Agreement which required LINA to pay a portion of plaintiff's past benefits and attorneys' fees. Ex. 8. The parties also agreed that in order to determine plaintiff's entitlement to future benefits, a medical and vocational assessment would be performed. This part of the Settlement Agreement is the focus of this dispute.

As permitted by the Settlement Agreement, a vocational expert, Intracorp, assessed the occupational demands of plaintiff's position at Permanente. Intracorp concluded that on a scale of 1 to 10, the overall stress level associated with plaintiff's position was generally at an 8 to 10 level. Stipulation, Ex. 7 at p. 34. Both plaintiff and the employer agreed with the assessment. *Id.,* at p. 39.

The parties then agreed upon the selection of Dr. Harvey Alpern, a cardiologist, to conduct an independent medical examination of plaintiff. According to the terms of the Settlement Agreement, the independent physician was to be asked:

> ... to opine whether and to what extent Abdel–Malek is capable of performing the requirements of a Staff Physiatrist at SCPMG as determined by the vocational specialist selected pursuant to paragraph 6. If the physician concludes that Abdel–Malek is capable of working as a Staff Physiatrist at SCPMG at greater than 80% of full time-basis, Abdel–Malek's claim under the Plan will be terminated.... If the physician concludes that Abdel–Malek is capable of working as a Staff Physiatrist at SCPMG at no more than 80% of full-time basis, Abdel–Malek will continue to receive benefits ....

Stipulation, Ex. 8 at p. 43, ¶ 7. The parties further agreed that the opinion of the selected specialist would be binding for a period of 12 months, after which either party would be free to request a reevaluation of plaintiff's condition in accordance with the terms and conditions of the Plan. *Id.,* at pp. 43–44, ¶ 8.

On April 3, 2002, Dr. Alpern examined plaintiff. On February 14, 2003, Dr. Alpern rendered his opinion. Specifically, Dr. Alpern concluded that plaintiff was "capable of working eighty percent of his regular duties, the other twenty percent being limited because of the fatigue factor." Dr. Alpern also stated that:

> I must state that he is at risk of future cardiac event because of his perceived stress in his work. The type of stress that he has is work demand stress with difficulties with being in the middle between patient problems and administrative problems and feeling lack of control. This fits with the Karasec model of occupational stress related to cardiovascular disease. In other words, he has high demand with lack of control. This is then associated with coronary artery

disease, as well as other conditions. He will need either to change his employment relationship or to have further stress reduction therapy so he can learn to handle the stress of which he is in the midst.

Stipulation, Ex. 1 at pp. 8–9.

Upon receipt of Dr. Alpern's report, LINA sought clarification. In particular, Dr. Alpern was asked to "comment on how these eighty and twenty percent working abilities were arrived at." Dr. Alpern responded: "This is what was given by you (LINA). There is no medical reason for the 20% disability." Stipulation, Ex. 2.

On May 2, 2003, LINA terminated plaintiff's benefits, effective April 30, 2003, contending that Dr. Alpern concluded that plaintiff was capable of working within his occupation with his heart condition, that he was capable of working 80% of his regular duties, and that the other 20% is limited because of fatigue. Stipulation, Ex. 10.

To resolve ambiguities perceived in Dr. Alpern's opinion, the parties deposed Dr. Alpern on July 7, 2003. Stipulation, Ex. 6. At that deposition, Dr. Alpern testified, among other things, that:

1. Plaintiff has a significant risk for a future cardiac episode if he continues to work in his present work environment, and the risk is "substantially higher" than for someone not in the same environment. Stipulation, Ex. 6 at p. 25 (at Deposition p. 26.)

2. Plaintiff was playing "Russian roulette" with a future cardiac event that would likely be catastrophic, and if he remained at his current work capacity, such a catastrophic heart attack was likely to happen. *Id.* at pp. 25–26 (at Deposition pp. 28–30.)

3. Plaintiff was capable of working 100% at his current job, but by doing so, he was at a higher risk of a future coronary event as a result of the stress associated with his job than an employee who had never had a coronary event. *Id.* at p. 22 (at Deposition pp. 16–17.)

4. Increasing plaintiff's work load by 20% would not be significant; however, he would have problems performing the material duties of his job on a 100% basis due to "persistence in pace" and fatigue. *Id.* at p. 23 (at Deposition pp. 20–21.)

5. Increasing plaintiff's workload an additional 20% would not be significant compared to the overall stress of the day. *Id.* at p. 24 (at Deposition p. 25.)

6. If plaintiff were a patient of Dr. Alpern, Dr. Alpern "very well might" advise him to stop working in his job because of the higher risk of a future cardiac event. *Id.* at p. 22 (at Deposition p. 14.)

Defendants interpreted Dr. Alpern's testimony to indicate that there is no medical basis for plaintiff's reduction in work hours, and thus no entitlement to further disability payments. Plaintiff filed the instant action to recover partial disability benefits under the Plan as modified by the Settlement Agreement. The opinion of Dr. Alpern is the only medical evidence that this Court may consider in determining whether plaintiff is disabled under the Plan and the Settlement Agreement.

### DISCUSSION

Under the Settlement Agreement, Dr. Alpern was to opine whether plaintiff is capable of performing the requirements of a physiatrist at Permanente at greater than, or no more than, 80% of full-time basis. Through his testimony, Dr. Alpern added an element to this question apparently not contemplated by the parties— whether plaintiff should be working at

Permanente *at all* in light of his condition. The Court believes that the resolution of this case turns on the answer to this question.

It is undisputed that plaintiff works in a stressful environment at Permanente, and that the stress experienced by plaintiff at work is the same as it was before his bypass surgery. Stipulation, Ex. 1 at p. 6. Dr. Alpern testified that this environment makes it more likely that plaintiff—working *any* amount of time—will have a future cardiac event than someone working in the same environment who does not have plaintiff's cardiac history. This evidence could support a claim of 100% disability under the Settlement Agreement and the Plan.[1] But Dr. Alpern also indicated that: the risk to plaintiff would not increase significantly if he works more than 80% of the time; increasing plaintiff's work duties would not be "more dangerous to [plaintiff's] health" since he did not believe that "the 20 percent was significant" (Stipulation, Ex. 6 at p. 23 (at Deposition p. 20)); plaintiff's work is still dangerous for someone with his condition, and he would advise plaintiff, if his patient, not to work at Permanente at all.

As set forth by defendant, the question to be resolved by the Court is whether or not plaintiff is capable of working full time at Permanente, *i.e.*, can he work 100% of the time. Defendants' Reply Trial Brief, at p. 4. The Court must determine whether plaintiff should be awarded disability payments for the 20% of the time he does not work in light of the fact that he chooses to put himself at risk the other 80% of the time by working. In other words, does "capable" of working as a physiatrist at Permanente include a condition that the work not put plaintiff at substantial risk to his health? The Court concludes that it does. In light of Dr. Alpern's testimony that, employed as he is, plaintiff is under a substantial risk for a future cardiac episode, the Court finds that it would be unreasonable to interpret "capable" to mean "capable until your condition kills you." The fact that plaintiff chooses to expose himself to this risk does not undo his disability. If he is totally disabled from working at Permanente, he should not be penalized for seeking only partial disability.

■ The Third Circuit has established that a plaintiff's decision to work at all, in the face of an increased risk to his health, should not defeat a finding of disability. In *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381 (3rd Cir.2003), the Court recognized that an effort to work—even when it is to the individual's detriment—does not equate with a finding of lack of disability. "A claimant's return to work is not dispositive of his or her disability when economic necessity compels him or her to return to work." *Lasser*, 344 F.3d at 392. As in *Lasser*, that principle is especially valid here where plaintiff's "disability was not observable and did not make it physically impossible for him to perform his job for a limited period." *Id.; see also Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702, 706 (11th Cir.1995) (an individual's attempt to work "does not for-

---

**1.** Defendant argues that the stress associated with plaintiff's performance of his job duties comes from working at Permanente, not from work as a physiatrist, and he can work in a less stressful position with another employer. Defendants' Reply Trial Brief, at pp. 2–3. Under the terms of the Settlement Agreement, the issue to be resolved by the Court is the degree to which plaintiff is capable of work-

ing *at Permanente.* In any event, even though plaintiff would not be disabled under the Plan if he could earn more than 80% of his pre-disability income from another employer, no evidence was presented to the Court that the stress level at some other facility would have enabled plaintiff to work without substantially increasing his risk of a future cardiac event.

ever bar ... collection of sickness disability benefits."); *Hawkins v. First Union Corp. Long–Term Disability Plan,* 326 F.3d 914, 918 (7th Cir.2003) ("[a] desperate person might force himself to work despite an illness that everyone agreed was totally disabling"); *Stark v. Weinberger,* 497 F.2d 1092, 1100 (7th Cir.1974) (the question is whether an individual was disabled within meaning of Social Security Act "notwithstanding the fact that [plaintiff] actually did work."); *Gross v. UnumProvident Life Ins. Co.,* 319 F.Supp.2d 1129, 1158 (C.D.Cal.2004) ("[t]he fact that the insured may do some business duties during the time for which he claims indemnity for total disability or even the fact that he may be physically able to do so is not conclusive evidence that his disability is not total, if reasonable care and prudence require that he desist.") (*quoting Fitzgerald v. Globe Indemnity Co.,* 84 Cal.App. 689, 697, 258 P. 458 (1927)). Here, while "reasonable care and prudence" perhaps should lead plaintiff to cease working at Permanente, or seek employment in a less stressful environment if one exists, defendants should not benefit from his decision to continue working.

■ Defendants argue that Dr. Alpern concluded that plaintiff is capable of working full time for Permanente, since the risk to plaintiff is the same at 80% or 100%

employment. Defendants' Reply Trial Brief, at p. 7. They further contend that the 80% is an arbitrary number selected by plaintiff to receive benefits, and there is no medical basis for reducing work time from 100% to 80%. But defendant's assertion that termination of benefits was proper since "Dr. Alpern opined that [plaintiff] was capable of working full-time [at] SCPMG" (Defendants' Opening Trial Brief, at p. 9), over-simplifies the matter. While he may be capable of walking through the door each morning and functioning as a physiatrist, he does so only by risking his physical health. As the testimony supports the conclusion that he should not be performing his duties at 80%, he should not perform those duties at 100%. Accordingly, in light of the unique set of facts presented here and the parameters set by the Settlement Agreement, the Court orders judgment in favor of plaintiff.[2,3]

### CONCLUSION

According to the evidence presented to the Court, plaintiff should not be working at Permanente at all. If plaintiff had ceased work altogether, defendant may well be paying him 100% of his disability benefits. The fact that plaintiff has chosen to work 80% of the time, against medical advice and to the detriment of his health,

**2.** Alternatively, plaintiff argues that he would not be able to perform at 100% because of fatigue. Dr. Alpern testified that, while there may be no medical difference between plaintiff working at 80% or 100% of full-time, plaintiff would have problems with "persistence in pace" if he increased to 100% employment. Defendants assert that plaintiff's claim of fatigue was related not to his cardiac condition, but rather to depression and psychiatric factors. Dr. Alpern did not conclusively opine in this regard. When asked if plaintiff could work 100% of the time on a consistent basis, Dr. Alpern responded that he "would refer [plaintiff] to a psychiatric specialist to give that answer." Stipulation, Ex.

6 at p. 14 (at Deposition p. 22). The Court does not believe that the evidence presented is sufficient to find that, if not for the risk involved, plaintiff could not physically work 100% of the time.

**3.** The Court does not decide, nor was it presented with the issue of, whether plaintiff is disabled under the terms of the Plan from working elsewhere at another time in the future. As defendants asserted at the bench trial, "[t]here may be a medical basis for a reduction [in working] to zero, and going to work for somebody else." Reporter's Transcript, p. 37, line 10–12.

relieves defendant from paying plaintiff 80% of the benefits to which he may be entitled. It does not relieve defendant of its obligation to pay him for the 20% of the time that he does not work.

Accordingly, IT IS ORDERED THAT judgment shall be entered in favor of plaintiff. The parties shall submit a proposed form of Judgment **no later than 14 days** from the date of this Order.