NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2302
_____

JOHN R. DUDA, M.D.;
NORTHWEST ORTHOPAEDIC SPECIALISTS, LLC.;
DONALD LEATHERWOOD, M.D.,
Appellants

v.

STANDARD INSURANCE COMPANY; LINCOLN NATIONAL LIFE
INSURANCE COMPANY; LINCOLN NATIONAL CORPORATION
d/b/a Lincoln Financial Group ("LFG");
DISABILITY INSURANCE SPECIALISTS, LLC
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-12-cv-01082)
District Judge:  Hon. Gene E.K. Pratter
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
April 28, 2016

Before:  McKEE, *Chief Judge*, JORDAN, and ROTH, *Circuit Judges*.

(Filed: May 10, 2016)
_____

OPINION*
_____

_____

    * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Dr. John Duda, an orthopedic surgeon and co-owner of Northwest Orthopaedic Specialists, LLC ("Northwest"), was denied disability benefits under both a group policy (the "Group Policy") issued by Standard Insurance Company ("Standard") and two personal insurance policies (the "Personal Policies") issued by Lincoln National Life Insurance Company ("Lincoln"). Thereafter, Duda sued Lincoln for breach of contract and bad faith under Pennsylvania law, and Duda, along with Northwest and Northwest's co-owner, Dr. Donald Leatherwood II, sued Standard under sections 502(a)(1)(B) and 502(a)(3) of the Employment Retirement Income Security Act (ERISA). After cross-motions for summary judgment, the United States District Court for the Eastern District of Pennsylvania granted summary judgment on all counts against all of the plaintiffs and in favor of the two insurance companies. Duda, Leatherwood, and Northwest (collectively, the "Appellants") now appeal. For the reasons that follow, we will affirm.

## I.      Background

Duda and Leatherwood formed Northwest on March 27, 1998, each as a 50% owner of that orthopedic practice. The same day, Duda formed John Duda, M.D., P.C. ("Duda PC"), a separate entity through which he conducted independent medical evaluations ("IMEs") and provided expert medical testimony. Duda is the president and sole member of Duda PC, which shares office space and employees with Northwest. In every year from 2001 to 2011, Duda's wages and other income from Duda PC greatly exceeded his partnership income from Northwest.

2

Much of the disagreement in this case is grounded in Duda's occupational duties prior to the alleged onset of his disability on August 10, 2007. As an orthopedic surgeon, Duda performed both open surgery (invasive procedures including total joint replacement surgery), and non-open procedures (involving minimally invasive surgical techniques, including arthroscopic surgery). His occupational duties also included in-office visits with patients, which involved patient consultations and non-surgical procedures such as joint aspirations, orthopedic injections, fracture treatments, and castings.

On March 5, 2009, Duda filed disability claims under both the Group Policy with Standard and the Personal Policies with Lincoln. He claimed that his disability began on August 10, 2007, but was caused by a wrist injury that occurred in "Spring 2000" when he fell into an excavation ditch and onto his outstretched hand.[1] (JA 1658; *see also* JA 2791.)

### A.    The Standard Claim

In order to qualify for either total or partial disability benefits under the Group Policy, Duda was required to prove not just that he was "Disabled" during the benefit period itself, but also that he was continuously Disabled during a preliminary "Benefit Waiting Period." (JA 1808-09; *see also* JA 1832 (stating "Benefit Waiting Period" to mean "the period you must be continuously Disabled before [long-term disability]

---

[1] Duda also claimed that he was disabled due to vitreal damage resulting from a 2007 boating accident. However, Duda's Opening Brief raised no arguments with respect to that alleged disability, and his Reply Brief does not dispute Standard's contention that he has abandoned that basis for his disability claims. Thus, we consider Duda's claims only with respect to his wrist injury.

Benefits become payable").) The defined period was 180 days. Duda could qualify as "Disabled" by showing that, "as a result of Physical Disease[ or] Injury," he was "unable to perform with reasonable continuity the Material Duties" of his "Own Occupation" (total disability) or he was unable to earn his "Own Occupation Income Level" (partial disability). (JA 1809.) To prove Disability, he was required to file a "Proof of Loss," which the Group Policy defined to mean "*satisfactory written proof* that you are Disabled and entitled to [long-term disability] Benefits." (JA 1827 (emphasis added).) The Group Policy did not, however, define what constitutes "satisfactory written proof."

In the disability claim forms that Duda sent to Standard, he provided proof that Leatherwood, acting as his attending physician, had diagnosed him with "Scapholunate Dissociation" – or so-called "SLAC[] wrist" – on his dominant right hand and had represented that Duda should stop working in or around "08/2006."[2] (JA 1658.) Duda also stated that, since the start of his disability, he had been "unable to perform total j[oin]t replacement [and] other open procedures," but that he continued to see "office patients" and perform arthroscopic surgery. (*Id.*) Upon Standard's request for records of Leatherwood's treatment of Duda, Leatherwood drafted a March 24, 2009 letter explaining that he had treated Duda "on a periodic basis" over the "last eight years" but "ha[d] not kept detailed formal records" because all such treatment was conducted merely as a professional courtesy to his business partner. (JA 1247.)

---

[2] *But see* JA 2795 (Leatherwood's Attending Physician Statement for Duda's Lincoln disability claims, also dated March 5, 2009, wherein he represented that he first noticed Duda's physical restrictions in "2007").

4

After Standard conducted further examination of the claim, its claim administrator informed Duda that it was denying his claim for benefits under the Group Policy. Then, during Duda's appeal of that determination, the Standard employee who was reviewing the claim requested copies of "all of [Duda's] medical records from at least January 1, 2006 through the present" that would be relevant to document the claimed disability. (JA 1592.) In a reply letter, Duda responded that, as an orthopedic surgeon, he "ha[d] been self treating for many years" and "ha[d] not kept any records documenting treatment." (JA 1210). By letter dated November 6, 2009, Standard notified Duda that it was denying his appeal.

## B. The Lincoln Claims

Lincoln is the successor insurer on the Personal Policies – comprised of Policy No. 000528000A[3] and Policy No. 000664107. Both Personal Policies cover total disability and residual disability. In the claim forms he sent to Lincoln, Duda described himself as "PARTIALLY disabled" as of August 10, 2007 (JA 2791 (original emphasis)); although he stated that he was "no longer able to perform total joint replacement or open corrective surgery," he acknowledged that he continued to work "40+" hours per week since the date of his disability (JA 2793), continued to "[s]ee patients in [his] office," and was "still

---

[3] As the District Court observed, Duda was originally covered by the now-inoperative Policy No. 000528000. *Duda v. Standard Ins. Co. et al.*, No. 12-1082, 2015 WL 1961170, at *7 n.4 (E.D. Pa. April 30, 2015). From Duda's arguments in the District Court, we infer that that previous policy may have provided a stronger basis from which to argue that Duda's regular occupation should have been defined solely in terms of his ability to perform orthopedic surgery. However, Duda has not raised the continuing efficacy of Policy No. 000528000 as an issue in this appeal.

doing non-open arthroscopic surgery" (JA 2791). As with the Standard claim, Leatherwood filled out a statement as Duda's Attending Physician, diagnosing Duda with "Scapho-Lunate Dissociation" and "SLAC [] Wrist (Scapho-Lunate Advanced Collapse)." (JA 2794.)

Although Duda had claimed to be only partially disabled, Lincoln apparently considered his eligibility for both total and residual disability benefits. It denied Duda's claims as they pertained to total disability, told him that it was "unable to approve Residual Disability benefits at this time," and requested additional medical, financial, and billing information so that it could make a final determination with respect to residual disability benefits. (JA 2831.) During Duda's appeal of the denial of his total disability claims, and after Lincoln made several more requests for additional information to analyze Duda's eligibility for residual disability benefits, Duda's counsel told Lincoln that Duda would not submit any of the requested information because he intended to focus "exclusively" on the total disability claims. (JA 2876.) Counsel allowed, however, that if Duda "elect[ed] to seek residual benefits at a later point in time," he would "then provide the additional information … ." (*Id*.) Lincoln affirmed the denial of Duda's total disability claims on November 4, 2011, and this litigation followed.

### C. Procedural Background

Duda, Leatherwood and Northwest filed a complaint in the District Court against Standard, Lincoln, and other subsequently dismissed defendants. (U.S. Dist. Ct. for E.D. Pa., *Duda v. Standard Ins. Co. et al.*, C.A. No. 12-1082, Docket Item #1.) The plaintiffs ultimately filed a second amended complaint asserting the following claims: Duda's

6

ERISA claim against Standard for wrongful denial of coverage (Count I); Northwest and Leatherwood's ERISA claim against Standard in their capacity as fiduciaries of the Group Policy (Count II); Duda's Pennsylvania common-law claim against Lincoln for breach of an insurance policy with respect to total disability benefits (Count III); Duda's bad faith claim against Lincoln under 42 Pa. Cons. Stat. § 8371 (Count IV); and Duda's claim against Lincoln for residual disability benefits under Pennsylvania common law and § 8371 (Count V). Upon cross-motions for summary judgment, the District Court granted summary judgment in favor of Standard and Lincoln and against Duda, Leatherwood and Northwest on all five counts. *Duda v. Standard Ins. Co. et al.*, No. 12-1082, 2015 WL 1961170, at *1 (E.D. Pa. April 30, 2015). This timely appeal followed.[4]

---

[4] In addition to the District Court's April 30, 2015 order granting summary judgment for the defendants, the Appellants' Notice of Appeal listed other orders of the District Court with which they disagree. But their briefing failed to mention, much less develop, any arguments regarding those other orders, so they merit no further consideration or comment.

## II. Discussion[5]

### A. ERISA Claims Against Standard (Counts I and II)

As a preliminary matter, we note that Count II has been waived on appeal. In Count II, Northwest and Leatherwood brought ERISA claims against Standard as purported fiduciaries with respect to the Group Policy. The District Court granted summary judgment in favor of Standard, concluding that ERISA did not give Northwest and Leatherwood statutory standing to sue Standard on Duda's behalf. Nowhere in the appellate briefing do the Appellants touch the issue of standing, nor does their Reply Brief respond to Standard's contention that they have thus "forfeited the issue on appeal." (Standard's Ans. Br. 26.) We therefore deem Appellants to have abandoned that issue. *See Nagle v. Alspach*, 8 F.3d 141, 143 (3d Cir. 1993) ("When an issue is either not set forth in the statement of issues presented or not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal."). Because the decision on standing was dispositive of Count II, we will affirm the District Court's grant of summary judgment on that count.

---

[5] The District Court had jurisdiction over the ERISA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e), and had supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367. We have appellate jurisdiction to review the District Court's final decision under 28 U.S.C. § 1291. We exercise plenary review of the grant of summary judgment, and apply the same standard the lower court was obligated to apply. *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 194 (3d Cir. 2002). "Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Carter v. McGrady*, 292 F.3d 152, 157 n.2 (3d Cir. 2002). For a dispute over a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As to Count I, the Appellants and Standard agree that Standard's decision not to award benefits is subject to review under an "arbitrary or capricious" standard.[6] *See Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009). Under that standard, a reviewing court "may overturn a decision of the Plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann-La Rouche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation marks omitted), *abrogated on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008); *Miller v. American Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011). We must therefore determine whether there was a reasonable basis for the administrator's decision, based on the facts known at the time the decision was made. *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 199-200 (3d Cir. 2002). In determining whether a decision by the plan administrator was arbitrary or capricious, "one of several factors" we consider is whether the administrator had a conflict of interest. *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009).

Although the District Court rejected Count I on multiple grounds, we conclude that the absence of satisfactory medical documentation that Duda was continuously disabled during the so-called "Benefit Waiting Period" was a sufficiently reasonable basis for Standard to deny both total and partial disability benefits. Duda submitted his claim on March 5, 2009 and represented that his last day working without disability was

_____

[6] Although that standard is sometimes described in terms of an "abuse of discretion," we have clarified that "[i]n the ERISA contest, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. American Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011).

9

on August 10, 2007. Regardless of the proof Duda may have supplied that he was disabled as of March 2009 or beyond, the express terms of the Group Policy required his claim to be supported by proof of disability during the preceding Benefit Waiting Period.

In its letter denying Duda's claim, Standard noted, among other things, that "[t]he available records document that you have received limited formal medical attention for these diagnoses over the past three years," and pointed out Standard's "receipt of a narrative from Dr. Leatherwood dated March 24, 2009 that admitted the lack of detailed formal records." (JA 1581.) The letter concluded that "review of the available records" did not provide "substantiation" that Duda had a "continuous Disability … throughout a 180 day Waiting Period for any period over the past 3 years." (JA 1582.)

In its letter reaffirming the denial of Duda's claim after independent administrative review, Standard again emphasized the lack of documentation of Duda's condition either before or after his claimed date of disability:

> With regard to your longstanding history of scapholunate dissociation, you report that your productivity with regard to open surgery has gradually and progressively decreased. Under circumstances regarding Disability as a result of a longstanding and/or progressive condition, it is reasonable for us to expect to find evidence of a notable worsening or progression of your condition as of or just prior to the date you claimed to be disabled (August 10, 2007), to reasonably support that you became Disabled as defined by the Group Policy.
>
> In this regard, [] Standard has not received any documentation of treatment for your right wrist contemporaneous to August 10, 2007. In fact, we have not received documentation of any medical treatment for your right wrist for over a year prior to that date (August 6, 2006) through the present, with the only exception being x-rays of your right wrist and hand that was performed on March 6, 2009.

10

(JA 1409.) The letter also observed that, when Standard requested copies of all of Duda's medical records with Leatherwood, it did not receive any records documenting Duda's treatment other than a letter dated March 24, 2009 in which Leatherwood described Duda's "symptoms *at this time*" – *i.e.*, over two weeks after Duda filed his claim for benefits and almost two years after the purported start of his disability. (JA 1410 (emphasis added).) The letter concluded that, "because records were not kept, we do not have satisfactory written proof substantiating that your condition precluded your ability to perform the Material Duties of your Own Occupation as of August 10, 2007, or even through the present." (*Id.*)

The paucity of medical records documenting Duda's condition between August 2007 and March 2009 makes it impossible to say that Standard's decision to deny Duda's claim for lack of "satisfactory written proof" was without reason, unsupported by substantial evidence, or erroneous as a matter of law. As the District Court observed, even assuming "satisfactory written proof" to be an ambiguous term, Standard's interpretation of that language is entitled to deference under the arbitrary-and-capricious standard of review unless it is "contrary to the plain language of the plan." *Skretvedt v. E.I. DuPont de Nemours & Co.*, 268 F.3d 167, 177 (3d Cir. 2001), *abrogated on other grounds by Glenn*, 554 U.S. 105. Because the Group Policy specifically required Duda to prove that physical disease or injury rendered him "continuously" disabled during a 180-day Benefit Waiting Period prior to March 5, 2009,[7] it was not contrary to the plain

---

[7] As mentioned above, March 5, 2009 was the date Duda submitted his disability claim to Standard.

language of the plan for Standard to reject Duda's claim based on the complete absence of contemporaneous medical records dating from that period.[8] Because that basis for denying Duda's claim – either for total or partial disability – finds adequate support in the record, we conclude that Standard's decision to deny the March 2009 claim cannot be overturned as arbitrary or capricious. Thus, it was not error for the District Court to grant summary judgment for Standard on Count I.[9]

### B. Breach of Contract Claims Against Lincoln (Counts III, IV and V)[10]

Under both Personal Policies, "total disability" is defined to mean that "the insured, due to injury or sickness, cannot perform the main duties of his or her regular occupation." (JA 2308; 2326.) By comparison, the Personal Policies define "residual disability" to mean that "the insured, due to injury or sickness, cannot perform all the main duties of his or her regular occupation full time, but: (a) can and is performing some of those duties; or (b) can perform all of those duties, but not full time … . At the same time, the insured must be earning at least 20% less than his or her monthly earned income

---

[8] As Standard points out, Duda has since supplied the record with documents and data that were not before Standard when it made its decision. Because inquiry into the reasonableness of Standard's decision is "based upon the facts as known to the administrator at the time the decision was made," we do not consider information that was unavailable to Standard at that point in time. *Smathers*, 298 F.3d at 200 (internal quotation marks omitted).

[9] Duda's other arguments for establishing that Standard's decision was arbitrary and capricious are similarly unconvincing, as explained in the District Court's thorough opinion.

[10] Lincoln concedes that Pennsylvania substantive law applies to the contract claims under the Personal Policies. Although Duda does not expressly address this point, his briefing does not contest the applicability of Pennsylvania law; rather, it operates from the assumption that such law does govern. We therefore apply Pennsylvania law to Counts III through V.

12

base." (JA 2302; 2322.) Reading the total and residual disability definitions together, it is clear that an insured who can still perform some of the main duties of his occupation is not eligible for "total disability" benefits.

With respect to Count III, Duda argues that his inability to perform open surgery rendered him totally disabled because "open surgery was the keystone and sole 'main duty' of [his practice] because it served as the magnet that drew the full array of surgical procedures performed at Northwest … ." (Op. Br. 39-40.) In this conception of his practice, arthroscopic surgery was not one of Duda's "main duties" because it was "merely one of many services that was provided as part of a comprehensive menu of orthopedic surgical services that were all generated and fueled by Dr. Duda's open surgery practice." (*Id*. at 43.) Nevertheless, even crediting the argument that open surgeries were the driver of Duda's practice, we do not think that a reasonable jury looking at this record could conclude that performing open surgery was the only one of his main duties. As the District Court noted, the parties do not dispute that "Dr. Duda performed thousands of arthroscopic surgeries from 1998 until 2009," and "performed more arthroscopic surgeries than open surgeries" in each of those years. *Duda*, 2015 WL 1961170, at *21. For example, between 2002 and 2006 – the five years preceding Duda's claimed start of disability in 2007 – Duda's billing codes show that non-open procedures (including but not limited to arthroscopic surgeries) accounted for over 91% of all procedures performed by Duda during that period, while total knee replacements and other open surgery procedures accounted for approximately 1.8% and 6.5%, respectively, of all procedures. Thus, even looking exclusively at Duda's orthopedic surgery practice

13

and ignoring his IME practice and other medical duties,[11] we still conclude that Duda simply cannot prevail on a theory that open surgery was the exclusive "main duty" of his regular occupation. Because Duda's inability to perform open surgeries did not preclude him from performing some of the main duties of his occupation at the time of his total disability claims, Lincoln did not breach the policies by denying those claims. Hence, the District Court was correct to grant summary judgment in favor of Lincoln on Count III.[12]

Consistent with that holding, we also conclude that Duda cannot prevail on his Count IV claim that Lincoln denied his total disability claims in bad faith. Duda disputes the District Court's conclusion that Count IV, brought under 42 Pa. Cons. Stat. § 8371, is barred by a two-year statute of limitations. However, even assuming Count IV is not time-barred, it must fail on the merits. Obviously, if no reasonable jury would find that Duda's inability to perform open surgeries, by itself, qualified him for "total disability" benefits, it necessarily follows that no reasonable jury would find that Lincoln lacked a reasonable basis for denying "total disability" benefits. Thus, the District Court properly granted summary judgment for Lincoln on that claim.[13]

---

[11] It is telling that Duda, in filing his disability claims with Lincoln, listed "all" the administrative and physical duties of his "current position" as including not just "Total Joint Replacement," but also "Open Reduction and Internal Fixation of Fractures, Arthroscopy, Office Visits, [and] IME." (JA 2793.)

[12] Duda also tries to get around his ultimate inability to prevail on Count III by alleging that Lincoln breached a contractual duty not in the actual denial of his claims, but in the process by which Lincoln reached that outcome. However, Duda fails to identify any specific contractual provision that was breached in that regard.

[13] Duda attempts to prop up his insurance-based bad faith claim under 42 Pa. Cons. Stat. § 8371 by claiming that Lincoln engaged in bad faith during the discovery stage of the instant litigation. However, Pennsylvania courts have held that § 8371

14

Finally, we conclude that the District Court correctly granted summary judgment for Lincoln on Count V, which alleged both breach of contract and bad faith in the denial of his claims for residual benefits under the Personal Policies.[14] Both Personal Policies define residual disability in relation to the insured's inability to perform "all the main duties of his or her regular occupation" – leaving the term "regular occupation" undefined. (JA 792, 814.) As relevant here, to qualify for residual disability, an insured "must be earning at least 20% less than his or her monthly earned income base." (*Id.*) In turn, "monthly earned income" is defined as "the amount of income, net of reasonable and necessary business expenses, earned in a calendar month by the insured *from his or her regular occupation … .*" (*Id.* (emphasis added).)

---

"clearly does not contemplate actions for bad faith based upon allegation of discovery violations." *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 908 (Pa. Super. Ct. 1999). Although the *Hollock v. Erie Insurance Exchange* case, upon which Duda relies, allowed for the possibility that an insurer's actions during litigation, at least in some circumstances, may be admissible evidence in support of the underlying bad faith claim, 842 A.2d 409, 414-15 (Pa. Super. Ct. 2004), it also emphasized that a bad faith claim is still established upon a showing that the insurer "refused to pay the proceeds of [the] policy" because of "a frivolous or unfounded reason," *id.* at 416.

[14] Duda's belated pursuit of residual benefits through litigation bears some mention. The District Court concluded that Duda's nonresponsive behavior during Lincoln's consideration of his residual benefits eligibility constituted a failure to cooperate with Lincoln's investigation of those claims, and hence defeated his Count V claim for residual benefits. *Duda*, 2015 WL 1961170, at *25-26. But, since we are reviewing the grant of summary judgment, and the determination of "[w]hether there has been a material breach of an insured's duty to cooperate is a question for the finder of fact," *Forest City Grant Liberty Assocs. v. Genro II, Inc.*, 652 A.2d 948, 951 (Pa. Super. Ct. 1995) (citing *Cameron v. Berger*, 7 A.2d 293, 296 (Pa. 1938)), we focus only on the District Court's alternative ground for denying Count V, namely that Duda's income level had not fallen to the point at which the definition of residual disability was met. *See Duda*, 2015 WL 1961170, at *26 n.25.

15

Duda admits that, if income from his lucrative IME practice is counted toward his "monthly earned income," he cannot qualify for residual disability by showing that he meets the 20% threshold of decreased earnings. Rather, he contends that his IME income should have been disregarded because IME work, though a substantial part of his earnings, is not part of his "regular occupation" as an orthopedic surgeon. The underlying basis of Duda's argument is that his unilateral description of his occupation in his insurance applications should operate, in effect, as a controlling definition. In his applications for both Personal Policies, Duda listed his full time occupation "for the past 3 years" as "Orthopedic Surgeon" and described his past duties in that occupation as "Those [Duties] Customary to the Performance of Surgery." (JA 800, 819.) In the course of litigation Duda has also submitted a signed statement representing that, when he purchased the policies, his understanding from his own "broker" and other "advisors" was that such policies "would protect [his] Orthopedic Surgery earnings regardless of ability to work at ANY job other than ORTHOPEDIC SURGERY," (JA 785-86 (original emphasis)), and that he therefore did not expect his work performing IMEs to disqualify him for disability benefits under the policies (*id.* at 786-87).

Notwithstanding Duda's own understanding of the policies, "Pennsylvania case law … dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured … . [and i]n most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997) (internal quotation marks omitted). Even clearly worded provisions "will not bind the insured

where the insurer or its agent has created in the insured a reasonable expectation of coverage," *id*., but in this case Duda has alleged that his expectations were influenced by his own advisors rather than by the insurer. Thus, the unambiguous language of the insurance contract controls. *See Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014) ("When the language of an insurance policy is plain and unambiguous, a court is bound by that language.").

Although our opinion in *Lasser v. Reliance Standard Life Insurance Company* was not applying Pennsylvania law, it concerned a policy with language almost identical to that considered here, defining disability in relation to the insured's ability to "perform the material duties of his/her regular occupation." 344 F.3d 381, 386 (3d Cir. 2003). We held that the term "regular occupation," likewise undefined in that case, was not ambiguous, instead concluding that "[b]oth the purpose of disability insurance and the modifier 'his/her' before 'regular occupation' make clear that 'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability." *Id*. Because the language in the Personal Policies is essentially identical to the provision in *Lasser*, the District Court was correct in concluding that, for purposes of assessing Duda's residual disability claims, the term "regular occupation" should be defined in relation to "the tasks actually performed before the onset of disability, not those tasks that are generally required of individuals in the insured's profession." *Duda*, 2015 WL 1961170, at *21. It was therefore proper for the District Court to consider

17

Duda's extensive IME practice as part of the tasks he was "actually performing" before the onset of his disability.[15]

Because Duda concedes, with admirable candor, that it is impossible for him to prevail on his residual benefits claims if his IME income factors into the analysis, our determination that IME work was part of Duda's "regular occupation" is dispositive of both the breach of contract and bad faith claims raised in Count V. Therefore, the District Court properly granted summary judgment for Lincoln on that count.

## III.    Conclusion

We will affirm the District Court's order granting summary judgment for both Standard and Lincoln on all counts.

---

[15] As the District Court pointed out, it is immaterial that Duda conducted his IME practice through a separate corporate entity, because "[n]othing in the Personal Policies suggests that Dr. Duda's regular occupation would be limited to his work for Northwest, especially when (a) Duda PC and Northwest operated out of the same office and used the same support staff, and their work was otherwise heavily coordinated and complementary, and (b) Dr. Duda spent significant time and earned significant money doing IMEs." *Duda*, 2015 WL 1961170, at *24. Despite Duda PC's separate corporate status, there can be no real dispute that IME work was part of the "usual work" that Duda was "actually performing" before the onset of his disability. *Lasser*, 344 F.3d at 386. This is an issue of contract interpretation, not the piercing of corporate veils.